1

2

3

4

5

6

7

8

9

10

11

## UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF WASHINGTON

12

13   United States of America, *ex rel.* Eva
      Zemplenyi, M.D., and Eva Zemplenyi,

14   M.D., individually,

15                              Plaintiffs,

16              v.

17   Group Health Cooperative, Group Health
      Permanente, Group Health Options, Inc.,

18   KPS Health Plans, Group Health Northwest,
      Michael Lee, M.D., Terrence Clark, O.D.,

19   John Does 1-20,

20                              Defendants.

No. C-09-0603-RSM

**AMENDED COMPLAINT FOR
VIOLATIONS OF THE FALSE
CLAIMS ACT, FRAUD, UNJUST
ENRICHMENT, AND
WRONGFUL TERMINATION IN
VIOLATION OF PUBLIC POLICY**

21

22                          **INTRODUCTION**

23        1.      This is an action against Defendants for damages and civil money penalties, and

24   other monetary relief, under the False Claims Act, 31 U.S.C. §§ 3729-3732 (FCA).  Plaintiffs also

25   seek damages under the common law theories of fraud, unjust enrichment, and wrongful

26   termination of employment in violation of public policy.

**AMENDED COMPLAINT -** 1

2.     A person with knowledge of an FCA violation (relator) may bring an action in federal district court on behalf of the United States: a *qui tam* action. The relator in this case is Eva Zemplenyi, M.D., who submitted this *qui tam* action for filing under seal on or about April 30, 2009. The Court ordered the matter unsealed on July 15, 2009.

3.     This action arises out of false claims for unnecessary medical services performed by Defendant Group Health Cooperative and its affiliated entities. Beginning in the mid-1990's, Group Health executives and chief physicians devised a scheme to increase Group Health's revenue from Medicare by increasing the number of cataract surgeries in violation of its own and Medicare reimbursement policies. A great number of these surgeries were performed without a showing of medical benefit or necessity. Defendants made numerous false claims in connection with documents submitted to Medicare and its contractors seeking payments based on, or reimbursement for, these unnecessary services. The initial false claims were also later used to support further false claims in the form of periodic data reports and annual bids submitted to Medicare in connection with Group Health's "Medicare Advantage" plans, resulting in fraudulently inflated "capitated" payments from Medicare.

4.     In furtherance of the false claims, explicit and implicit directives were made by management-level physician chiefs in the ophthalmology and optometric departments and by other executives in Defendants' organization. Through these directives, management communicated to health care providers including Plaintiff Eva Zemplenyi, M.D. the organization's plan to increase revenue by performing increasing numbers of cataract surgeries on its patient population without regard for the appropriate care for any individual Group Health patient or member. The directive to do more surgeries was motivated solely by a desire for financial gain, and ignored federal regulations, the independent judgment of physicians, and

Lybeck♦Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA 98040-2334
206-230-4255  Fax 206-230-7791

1    concerns for patient safety and well-being.

2       5.      During one data period, Group Health promoted a 100% increase in cataract

3    surgeries.  This increase was grossly disproportionate to the growth of the Group Health patient

4    population generally.

5

6       6.      At the same time that Group Health was promoting inappropriate surgeries, it also

7    shifted otherwise appropriate services and procedures away from Group Health ophthalmologists

8    and toward lesser qualified optometric physicians.   This shift was also intended to cause

9    ophthalmologists to perform more lucrative surgical procedures whether or not appropriate.  As an

10   additional consequence, Group Health optometric physicians performed medical services beyond

11   the appropriately licensed scope of their practice.

12

13      7.      When documented cases of unwarranted surgical procedures were reported within

14   Group Health to Group Health's Medicare compliance staff, compliance officers recognized that

15   unnecessary cataract surgeries were being performed and that Medicare may have been billed for

16   charges which violated Medicare and Group Health regulations.

17      8.      Defendant Michael Lee, M.D., the Chief of Group Heath's ophthalmology

18   department, learned of reports being made of unnecessary surgeries.  Rather than stopping these

19   surgeries, Dr. Lee confronted the Medicare compliance officer and demanded to know the identity

20   of the individual who had reported the abuse.  He specifically demanded to know whether Dr.

21   Zemplenyi had made the report.  The Medicare compliance officer feared that Dr. Lee may seek to

22   retaliate against Dr. Zemplenyi and she reported her concerns to Dr. Zemplenyi.  Her concerns

23   proved well founded.  After her report of abuse, Dr. Zemplenyi faced months of hostility from Dr.

24   Lee and others.  She was ultimately constructively discharged and forced to quit her nearly 20-

25   year employment as a physician at Group Health after reporting the scheme.

26

**AMENDED COMPLAINT - 3**

Lybeck◆Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

9.    Not only did Defendants' actions harm Dr. Zemplenyi personally and financially, their actions also defrauded the U.S. Treasury and the taxpayers who funded it in an amount estimated to exceed $1 million dollars.  Group Health's actions also placed at risk hundreds of vulnerable patients who underwent ill-advised and inappropriate surgeries.

## JURISDICTION AND VENUE

10.    This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-3733, and common law.  This Court has subject matter jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a), 28 U.S.C. § 1331, 1345; over the remaining claims pursuant to 28 U.S.C. § 1345; and over all claims pursuant to the Court's general equitable jurisdiction.

11.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).  31 U.S.C. § 3732(a) provides that in actions brought under 31 U.S.C. § 3730 venue is proper in any judicial district where one or more Defendants can be found, where they reside, where they transact business, or where any act proscribed by 31 U.S.C. § 3729 occurred. Defendants continuously transacted business in this District at all relevant times.  In addition, a substantial number of the events giving rise the claims set forth in this Complaint occurred in this District.

## THE PARTIES

12.    Plaintiffs are the United States of America (United States or Government) and Eva Zemplenyi, M.D.  The United States filed this Complaint on behalf of the Department of Health and Human Services (HHS) and the Centers for Medicare and Medicaid Services (CMS), formerly known as the Health Care Financing Administration (HCFA), on behalf of the Medicare program.

AMENDED COMPLAINT - 4

Lybeck✦Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA 98040-2334
206-230-4255  Fax 206-230-7791

13.     Defendant Group Health Cooperative claims to be "a consumer governed non-profit healthcare system". It claims to be governed by "an independent board of trustees comprised of eleven consumers elected by Group Health's voting members". However, in 2008 Group Health took in over $2.76 billion dollars in total revenues, including $647,409,000 from Medicare.

14.     Defendant Group Health Permanente (GHP) is a corporation under exclusive contract to provide care in Group Health Cooperative-owned or -operated facilities for patients of Group Health Cooperative. GHP works in close coordination with management of Group Health Cooperative. At all relevant times except where mentioned, Dr. Zemplenyi was an employee of GHP.

15.     Defendant Group Health Options, Inc., KPS Health Plans and Group Health Northwest were and/or are wholly-owned subsidiaries of Group Health Cooperative. These subsidiaries provide a variety of heath care plans for groups and individuals throughout the State of Washington.

16.     At all relevant times Defendants Group Health Cooperative, GHP, Group Health Options, Inc., KPS Health Plans and Group Health Northwest were and/or continue to be organized under the laws of Washington. They are each based in Seattle, Washington.

17.     Defendant Michael Lee, M.D. is Chief of Ophthalmology for GHP. Dr. Lee has had direct oversight of the work of Dr. Zemplenyi, and was directly responsible for her constructive discharge.

18.     Defendant Terrance Clark, O.D., is an optometric physician. He is the Chief of GHP's Federal Way clinic. At all relevant times, as part of Defendants' scheme, Dr. Clark has expanded the scope of his practice to include procedures which exceed the scope of his license.

He has been investigated and sanctioned by the Washington State Department of Health for performing unlicensed surgery or invasive procedures.

19.     Defendants John Does 1-20 are presently unknown individuals who are directors, officers and/or other key employees of Group Health Cooperative and/or GHP.  At all relevant times these individuals were involved in creating, advising on and/or issuing directives to increase Medicare revenues through performing additional medical procedures ostensibly related to the treatment of cataracts, which are described in more detail below.  These individuals were also involved in creating policies that ultimately led to the submission of false claims described in detail below.

## BACKGROUND

A.     **False Claims Act**

20.     The FCA provides, in pertinent part:

> (a)  Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; ... or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,
>
> * * *
> is liable to the United States Government....
>
> (b)  For Purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information;

Lybeck♦Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255  Fax 206-230-7791

1   (3) acts in reckless disregard of the truth or falsity of the
    information, and no proof of specific intent to defraud is
2   required.

3   31 U.S.C. § 3729.

4
    31 U.S.C. § 3730(h) provides:
5
6           Any employee who is discharged, demoted, suspended,
            threatened, harassed, or in any other manner discriminated
7           against in the terms and conditions of employment by his or
            her employer because of lawful acts done by the employee on
8           behalf of the employee or others in furtherance of an action
            under this section, including investigation for, initiation of,
9           testimony for, or assistance in an action filed or to be filed
            under this section, shall be entitled to all relief necessary to
10          make the employee whole. Such relief shall include
            reinstatement with the same seniority status such employee
11          would have had but for the discrimination, 2 times the
            amount of back pay, interest on the back pay, and
12          compensation for any special damages sustained as a result
            of the discrimination, including litigation costs and
13          reasonable attorneys' fees. An employee may bring an action
14          in the appropriate district court of the United States for the
            relief provided in this subsection.
15          ***

16
17  **B.      The Medicare Advantage Program, Bidding and Payments**

18      21.     In 1965, Congress enacted Title XVIII of the Social Security Act, known as the

19  Medicare program, to pay for the costs of certain healthcare services.  Entitlement to Medicare is

20  based on age, disability or affliction with end-stage renal disease.  *See* 42 U.S.C. §§ 426, 426A.

21      22.     The Department of Health and Human Services (HHS) is responsible for the

22  administration and supervision of the Medicare program.  The Center for Medicare and Medicaid

23  Services (CMS), formerly known as the Health Care Financing Agency (HCFA), is an agency of

24  HHS and is directly responsible for the administration of the Medicare program.

25

26      23.     Part A of the Medicare Program authorizes payment for institutional care,

Lybeck❖Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA 98040-2334
206-230-4255  Fax 206-230-7791

1   including hospital, skilled nursing facility and home health care.  *See* 42 U.S.C. §§ 1395c-1395i-

2   4.  Medicare's Supplementary Medical Insurance, Part B, covers physicians' services, outpatient

3   care, and other services not covered by Part A, including outpatient surgeries and procedures.  *See*

4

5   42 U.S.C. §§ 1395j-1395w-4.  Generally, medical providers offering services under Parts A and B

6   are paid a reimbursement from CMS for each service rendered to Medicare beneficiaries, in a

7   "fee-for-service" arrangement.

8       24.     With the passage of the Balanced Budget Act of 1997, Medicare beneficiaries

9   were given the option to receive their Medicare benefits through comprehensive health insurance

10  plans, instead of through the original Medicare Parts A and B.  These programs were originally

11  known as "Medicare+Choice" or "Part C" plans.  *See* 42 U.S.C. §§ 1395w-21-1395w-29.

12

13  Pursuant to the Medicare Prescription Drug, Improvement, and Modernization Act of 2003

14  (Medicare Modernization Act), Medicare+Choice plans were subject to the addition of

15  prescription drug coverage and became known as "Medicare Advantage" (MA) plans.

16      25.     Health Maintenance Organizations (HMOs) such as Group Health Cooperative

17  have long been afforded a special role in delivering services to Medicare beneficiaries.  In

18  1982, HMOs were given the opportunity to provide all necessary medical services for enrolled

19  beneficiaries in exchange for a per capita or "capitated" payment per patient, then set at 95% of

20  the fee-for-service costs per capita in the relevant U.S. county.  HMOs are now offering various

21

22  MA plans including all medical benefits for enrolled member beneficiaries, and other

23  advertised supplemental benefits.  Pursuant to contracts with CMS, organizations offering these

24  plans are paid by CMS on a capitated basis, typically in a lump sum per member, per month.

25      26.     Contrary to the expectation that MA plans would increase competition and help

26  drive down Medicare spending by increasing efficiencies, actual payment levels are significantly

Lybeck◆Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255  Fax 206-230-7791

1    above those for traditional fee-for-service arrangements. It was estimated that in 2009 payments

2    to organizations offering MA plans ("MA organizations" or MAOs) would cost CMS 113% of

3    the cost of providing the same benefits under the traditional fee-for-service system.

4
5              27.      Under a bidding mechanism established by the Medicare Modernization Act, each

6    MAO offering an MA plan now submits to CMS a bid that represents the payment it anticipates

7    for providing all traditional Medicare Part A and B benefits to plan enrollees. The bid contains all

8    the MAO's estimated costs, including administrative expenses, and its profit margin. *See* 42

9    C.F.R. §422.254(b).

10             28.      The bid is calculated and submitted in accordance with a "Medicare Advantage

11   Bid Pricing Tool". The Bid Pricing Tool requires cost data from a base period organized

12   according to benefit service categories, including such services as surgical procedures. These

13   data are required to provide a current best estimate of incurred costs on the basis of actual

14   experience. The annualized utilization per thousand enrollees for each of the benefit service

15   categories during the base period must also be included. Utilization, average unit cost, and

16
17   other measurements, adjustments and assumptions are used to make a projection of the total

18   costs for the forthcoming contract year. This projection is presented to CMS via the Bid

19   Pricing Tool based on input from actuaries employed by MAOs. CMS can only accept an

20   MAO's bid when "[t]he bid amount...equitably reflects the plan's estimated revenue

21   requirements for providing the benefits under that plan..." 42 C.F.R. §422.256(b)(2),

22
23             29.      The bid submitted by each plan is compared with a "benchmark" rate that is

24   periodically determined by CMS for each U.S. county. Each plan receives from Medicare a

25   payment rate equal to the benchmark rate if its bid is equal or greater to the benchmark rate, or

26   its bid plus a "rebate" if its bid is less than the benchmark. 42 C.F.R. §422.304. Because

**AMENDED COMPLAINT - 9**

1    benchmarks--intended to incentivize the offering of MA plans in underserved areas--are often

2    set well above what it costs Medicare to provide benefits to similar beneficiaries under the

3    traditional fee-for-service system, MA plan payment rates greatly exceed comparable fee-for-

4

5    service spending.

6          30.      Beginning in 2004, CMS began to phase in a system of adjusting the per-patient

7    capitation payments for individual MA plan enrollees based on the CMS Hierarchical Category

8    Condition (CMS-HCC) risk adjustment model. 42 C.F.R. §422.308(c),(e). "Each MA

9    organization must submit to CMS (in accordance with CMS instructions) the data necessary to

10    characterize the context and purposes of each item and service provided to a Medicare enrollee by

11

12    a provider, supplier, physician, or other practitioner." 42 C.F.R. §422.310(b). Based on these data

13    submissions, CMS evaluates each patient's demographic characteristics, diagnoses, and

14    treatments in inpatient, outpatient and physician settings. Generally, beneficiaries diagnosed with

15    more illnesses and receiving more services would rate a higher capitation payment to their MAO,

16    likely in excess of the benchmark rate.

17          31.      Due to the nature of the bidding and risk adjustment mechanisms, a number of

18    claims or data submitted reflecting services rendered in one plan year would increase the

19

20    amount of capitation payments for enrolled beneficiaries in subsequent plan years.  A

21    substantial number of false claims would dramatically increase the capitation payments.

22          32.      MAOs regard information concerning their bid submissions and capitation

23    payments from CMS as "proprietary", and refuse to make this public funding information

24    available to the public.  Surprisingly, CMS generally does not oppose this secrecy and has

25    indicated that it will not disclose MAO bid and payment information in the absence of special

26    requests or court orders.

**AMENDED COMPLAINT - 10**

Lybeck◆Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA 98040-2334
206-230-4255   Fax 206-230-7791

33.     The U.S. Government has only recently recognized the potential for false claims and fraud within the Medicare Advantage capitated payment system.  Complaints have recently been filed by the U.S. Attorney for the Southern District of Florida targeting fraud and false claims perpetrated in connection with MA plans. *See U.S. v. D&A Therapy Center, et al*, Case No. 08-CV-21954-KMM (S.D. Fla.); *U.S. v. Huarte, et al*, Case No. 09-CR-20523-PAS (S.D. Fla.)

### C. Requirements of Medical Necessity for Surgical Procedures.

34.     In addition to other limitations on coverage, Medicare covers only those services that are "reasonable and necessary for the diagnosis or treatment of illness or injury...." 42 U.S.C. § 1395y(a)(1)(A).  As a condition of their contracts with CMS, all MAOs are expressly required to adhere to the False Claims Act and other "[f]ederal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse..." 42 C.F.R. §422.504(h)(1).  In turn, MAOs must also ensure that any agreements delegating responsibilities to contractors and related entities specify that such contractors and related entities must also comply with all applicable Medicare laws, regulations and CMS instructions. 42 C.F.R. §422.504(i)(4)(v).  The risk adjustment data submitted by MAOs must "conform to the requirements for equivalent data for Medicare fee-for-service when appropriate, and to all relevant national standards." 42 C.F.R. §422.310(d).  These data must also account separately for each physician or other practitioner that would be permitted to bill separately under the original Medicare program, even if they participate jointly in the same service. 42 C.F.R. §422.310(c)(2).

35.     At all times relevant to this action, CMS contracted with Noridian Administrative Services, LLC ("Noridian") to administer Medicare claims in the region where Defendants operate.  Pursuant to its contract and applicable regulations, Noridian examined claims submitted

Lybeck♦Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA 98040-2334
206-230-4255  Fax 206-230-7791

1  by health care providers in the local area, including Group Health, and determined whether to

2  accept or deny claims.

3      36.    In coordination with Medicare, Noridian has developed specific criteria for

4  determining whether cataract surgery is warranted. The criteria define the initial pre-operative

5

6  clinical evaluation of a patient that is necessary to justify cataract surgery for purposes of

7  Medicare coverage. Medicare provides coverage for cataract surgery only when it is reasonable

8  and necessary for the treatment of beneficiaries and only if it is documented that each beneficiary

9  meets all of the following criteria:

10      1.    The patient has undergone standardized formal measure of his or her

11          visual functional status which suggest it can be improved commensurate the risk

12          of cataract surgery;

13

14      2.    The patient has impairment of visual function due to cataract resulting in:

15          a.    Decreased ability to carry out activities of daily living;

16          b.    Snellen visual acuity of 20/50 or worse, unless:

17              i.    The patient is able to carry out activities of daily living

18                  with other non-operative means,

19

20              ii.   The operative risk is not commensurate with the potential

21                  benefit to the patient, and

22              iii.  Diabetic retinopathy rather than cataract is the limiting

23                  factor of visual function;

24      3.    The patient has been educated about the risks and benefits of cataract

25          surgery and has provided informed consent; and

26      4.    The patient has undergone an appropriate pre-operative ophthalmologic

**AMENDED COMPLAINT** - 12

1   examination, generally including Snellen acuity and refraction on both

2   eyes with recorded results.

3      37.      In addition to these criteria, Noridian and Medicare also require that there be a

4

5   *maximum* interval of three months between the pre-operative examination and the date

6   of surgery.  This interval is intended to allow for observation of significant changes in the

7   patient's health or vision before surgery is performed.

8      38.      Noridian and Medicare also forbid performing cataract surgery on both eyes on

9   the same day because of the potential for bilateral visual loss.  They require that the patient and

10   the physician have sufficient time to assess the results of the first eye surgery to determine both

11   the need and appropriate timing for potential surgery on the second eye.   Under

12   Medicare/Noridian regulations, surgery is contraindicated and should not be performed if it will

13

14   not improve visual function.

15      39.      At all times relevant to this action, when Defendants sought reimbursement for

16   medical services from Noridian, they were required to complete reimbursement claim forms and

17   submitted them to Noridian.  Form CMS-1500, sometimes called the "AMA form", is the basic

18   form prescribed by CMS for Medicare claims.  Medicare requires medical providers to accurately

19   identify on the claim form the services they perform by using the codes contained in the American

20   Medical Association's Current Procedural Terminology manual, which are commonly referred to

21

22   as "CPT codes".  The claim forms also require that the diagnosis code accurately identify the

23   medical diagnosis or patient's condition requiring the medical procedure.   In addition, the health

24   care provider is required to sign the form and state that "I certify that the services shown on this

25   form were medically indicated and necessary for the health of the patient..."

26      40.      Forms are submitted electronically or by mail.   Before Noridian and other

Lybeck✦Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA 98040-2334
206-230-4255  Fax 206-230-7791

Medicare administrators will accept electronically submitted claims, medical providers must agree in writing that they will be responsible for the accuracy of the Medicare claims submitted on their behalf and that all claims submitted under their provider identification numbers would be accurate, complete and truthful.

41.     Under traditional Part A and B fee-for-service arrangements, upon receiving a Medicare claim form, Noridian, applies its own and CMS policies and determines whether the procedure is documented as medically necessary and whether the claim otherwise qualifies for payment. Noridian also computes the proper amount of reimbursement for qualified claims.

42.     Providers rendering services to beneficiaries under MA plans in the region where Defendants operate typically complete and submit the same or similar forms as those submitted to Noridian for Part A and B claims. Defendant Group Health Cooperative specifically required its contracted providers, including GHP physicians, to account for all diagnosis and procedure data that is required in the CMS-1500 form, advising them that claims made under its MA plans were "subject to all Medicare billing requirements."

**FACTS COMMON TO ALL CLAIMS**

A.     **Motivation for Profit in the Group Health Cooperative System**

43.     Despite Group Health's status as a "non-profit organization", its top officers are highly compensated. For 2008, Group Health reported to the Internal Revenue Service that its president and CEO Scott Armstrong's compensation exceeded $1 million. Rick D. Woods, Group Health's executive vice president and general counsel, reported compensation exceeding $500,000. Group Health reported that at least a dozen additional officers earned in excess of $250,000 per year during 2008. These officers reportedly also received tens of thousand dollars in additional benefits during the same year.

**AMENDED COMPLAINT - 14**

44.     By contrast, the board of trustees who Group Health claims to be "governed by" earned paltry sums.  Trustee chair Jerry F. Campbell was paid only $11,875 for his services in 2008, and the remainder of the board members were paid less than $8,000 each.

45.     Group Health executives, clinic managers, and clinic staff are also paid incentives and bonuses based on performance and productivity.  Assessments of productivity for purposes of financial incentives depend heavily on "Relative Value Unit" calculations.  Relative Value Units are assigned to each service rendered by the group or clinic.  The calculations are described in detail below.

46.     In addition to treating patients, Group Health and GHP physicians also commonly have executive and managerial roles as well.  These physicians' salaries are based in significant part upon their administrative versus medical functions.  Many physician/administrators receive promotions through the executive ranks resulting in higher compensation based on the productivity of the physicians operating under their administrative control, measured largely by Relative Value Unit calculations.

**B.      Group Health's Scheme to Increase Relative Value Units and Revenue via False Claims**

47.     In order to better facilitate orderly and consistent billing and payment of claims for health care services, between 1985 and 1992 Medicare created and implemented the Resource-Based Relative Value Scale (RBRVS).   One of the central components of this system is the Relative Value Unit (RVU).   RVUs are nonmonetary, numeric values that Medicare has developed to represent the relative amount of physician time, resources, and expertise needed to provide various services to patients.

48.     Medicare bases RVUs on three components: (1) physician work (which takes

**AMENDED COMPLAINT - 15**

1    into account the physician's expertise and time spent in preparation and follow-up

2    documentation of each service performed); (2) practice expense (which accounts for the cost to

3    operate a medical practice); and (3) professional liability insurance expense (which estimates

4

5    the relative risk of services). The amount of compensation a provider receives from Medicare

6    for a service depends heavily on the RVUs assigned to that service.

7          49.    Typically, surgical procedures are afforded a high number of RVUs, especially

8    compared with other physician services, such as office visits, examinations, or testing. For

9    example, according to the American Medical Association's 2008 data for the Seattle region, the

10    most commonly performed cataract surgery, extracapsular cataract removal with insertion of

11    intraocular lens prosthesis (CPT code 66984), was worth 17.68 RVUs. By contrast, a

12    comprehensive medical examination and evaluation of an existing patient by an

13    ophthalmologist (CPT code 92014) was worth only 1.91 to 2.84 RVUs. An ophthalmologist

14

15    performing a cataract surgery would be considered <u>more than six times more productive and</u>

16    <u>profitable</u> while in surgery than while performing necessary pre- or post-operative clinical

17    examinations.

18          50.    In connection with surgical procedures, health care providers typically also charge

19

20    a "facility fee". This fee is ostensibly related to costs incurred by the facility where surgeries are

21    performed. According to Medicare and Noridian guidelines, claiming a facility fee in connection

22    with cataract surgery is subject to the same requirements of medical necessity as the surgery itself,

23    including the specific criteria described in detail above.

24          51.    Due to the requirement that bids for payment reflect an MAO's actual "costs"

25    during the prior year (and the requirement that MAOs submit data reports to CMS for purposes of

26    risk adjustment reflecting actual treatments and diagnoses for its enrolled population), submitting

**AMENDED COMPLAINT - 16**

1  additional reports and claims for surgical procedures potentially results in significantly increased

2  capitated payments, even more so than office visits, examinations, or testing.  This potential

3  increase in payments, along with an MAO's relatively fixed costs of providing a given medical

4  service, provides an incentive for rendering high-RVU services more frequently, including

5  inappropriate cataract surgeries.

6

7      52.     Historically, Medicare billing for services related to the treatment of cataracts has

8  been subject to widespread abuse by health care providers.  The Office of the Inspector General

9  for HHS prepared a March 1986 report following a study of Medicare reimbursement for

10  cataract surgeries in California, New York, Florida, Pennsylvania, Texas and Washington.  The

11  report noted that the House Subcommittee on Health and Long Term Care projected that fraud,

12  waste, and abuse related to cataract surgeries cost the taxpayers over $2 billion in 1985.  The

13  Inspector General concluded that, even putting aside medically inappropriate surgeries,

14  unnecessary costs incident to Medicare claims for these surgeries totaled over $500 million per

15  year.  A subsequent report by the Inspector General specifically found that Medicare had spent

16  $29.4 million in 1988 for medically unnecessary cataract surgeries.

17

18      53.     About one decade after this potential for abuse was first identified, Defendants

19  implemented their own plan to increase Medicare revenues from unnecessary cataract surgeries.

20  Beginning in 1994, Defendants' organization saw a dramatic increase in the number of surgeries

21  performed by ophthalmologists.  Just within the Central Ophthalmology clinic in Seattle, there

22  was an increase from 738 surgeries in 1993, to 916 surgeries in 1994, 1,048 surgeries in 1995,

23  1,241 surgeries in 1996, and 1,312 surgeries in 1997.  After a slight decline in 1998, there were

24  1,365 surgeries in 1999 and 1,499 surgeries in 2000.  The data alone demonstrate a doubling of

25  the surgeries performed annually in the Central clinic over the 1994-2000 time frame.  At the

26

**AMENDED COMPLAINT** - 17

Lybeck◆Murphy LLP
7525 SE 24ᵗʰ Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255  Fax 206-230-7791

1   same time, the number of patients seen by Central Ophthalmology actually declined sharply
2   between 1996 and 1999. Even in increasing during 2000, the number still did not match the
3   numbers from the mid-1990's. Again, these data do not include hundreds of additional surgeries
4
5   being performed during the same period in the separate Eastside Clinic.

6       54.     After Dr. Lee became Chief of Ophthalmology in January 2006, he undertook
7   various efforts to increase RVUs by increasing the number of inappropriate cataract surgeries.
8   When Dr. Lee first met with Dr. Zemplenyi following his promotion, he instructed her to increase
9   the number of RVUs she generated. Given her patient population, this required performing more
10  RVU-heavy cataract surgeries. Dr. Lee also stressed to Dr. Zemplenyi and her colleagues the
11
12  importance of minimizing referrals to qualified external physicians so as to ensure greater RVU
13  production for GHP physicians.

14      55.     Dr. Lee convened a number of departmental meetings in 2006 and 2007. At each
15  meeting, Dr. Lee ordered the ophthalmologists present to increase RVUs, requiring that they
16  perform more cataract surgeries. Dr. Zemplenyi began to suspect that many surgeries were being
17  performed inappropriately in violation of Medicare criteria. Dr. Lee's directives to perform more
18
19  surgeries were made without regard to the interests of any particular patient and without regard for
20  the medical necessity of surgery.

21      56.     Ophthalmology department data show the effect these directives and other
22  revenue-spiking demands have had on the number of surgeries performed. During the first
23  quarter of 2006, ophthalmologists performed at least 487 cataract surgeries. Annualized, this
24  quarterly figure corresponds to 1,948 surgeries.

25      57.     The most recent data available demonstrate a continuing sharp rise in the number
26  of surgeries despite a patient population that remains level. In 2007, GHP ophthalmologists

**AMENDED COMPLAINT - 18**

1   performed 2,987 (mostly cataract) surgeries.  During the first half of 2008, there were 1,744

2   surgeries.  Projected at an annual pace, this amounts to 3,488 surgeries, a 17% increase over the

3   prior year.[1]

4

5   58.    While demanding that ophthalmologists perform ever increasing numbers of

6   surgeries, Defendants made additional efforts to shift otherwise appropriate services and

7   procedures away from ophthalmologists and toward lesser qualified optometric physicians.  This

8   was intended to keep ophthalmologists performing only the lucrative surgical procedures while

9   reducing the total systemic costs of capitated care.   This effort also resulted in optometric

10  physicians performing medical services they were not qualified or licensed to perform.

11  59.    Defendants continued their internal and external efforts to increase RVUs in

12  connection with Eye Care Services.  At a recent ophthalmology department meeting, Medical

13  Director Marc Mora, M.D. directed GHP ophthalmologists to increase RVUs by performing more

14  surgeries.  Chief Medical Executive Michael Soman, M.D. also promoted the Eye Care Services

15  department's increased RVUs.  In fall 2008 Defendants boasted of performing "3,000 cataract

16  surgeries a year".

17  60.    In connection with Defendants' conduct described in detail above, from at least

18  2002 through the present, Defendants have submitted hundreds if not thousands of claim forms,

19  data reports, and/or other documents containing or reflecting false claims for medically

20  unnecessary and inappropriately documented cataract surgeries.  As a result of submitting these

21  false claims and data, Group Health and its affiliates have received substantially enhanced and

22  inflated capitated payments from CMS.  Dr. Zemplenyi is personally aware of at least 10

---

[1] These most recent data may include a small portion of non-cataract surgeries, though the estimated count of total surgeries has been reduced to exclude all procedures performed by certain GHP ophthalmologists known to specialize in non-cataract procedures.

**AMENDED COMPLAINT - 19**

Lybeck❖Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA 98040-2334
206-230-4255   Fax 206-230-7791

1   individual cases resulting in false claims from within just the past few years.

2        **C.**     **Dr. Zemplenyi's History of Recognized Excellence with Group Health**

3        61.     For nearly twenty years, Dr. Zemplenyi was a dedicated employee of Group Health

4

5   and GHP.  Throughout her tenure, she was committed to professional excellence, appropriate care

for her patients, and the institutional integrity of Group Health.  During these years, Group Health

6

7   and its supervisory staff frequently recognized Dr. Zemplenyi's dedicated and excellent work.

8        62.     Dr. Zemplenyi graduated *magna cum laude* from Harvard University in 1979, and

9   received her Doctor of Medicine degree in 1983 from the School of Medicine at the University of

10  California, Los Angeles.   In 1984, she completed a Medical Internship at Veteran's

11  Administration Hospital in Sepulveda, California.  From 1985 through 1987, she was a Resident

12

13  in Ophthalmology with the Jules Stein Eye Institute at UCLA.

14      63.     Dr. Zemplenyi joined Group Health in June 1988.  She began working at the

15  Central Ophthalmology clinic in Seattle, and remained there until early 2006.

16      64.     Group Health routinely conducted Annual Performance Reviews of its providers,

17  including consultative specialists like Dr. Zemplenyi.  Dr. Zemplenyi had for years received

18  uniformly positive reviews.  In fact, in a November 1, 2005 Review, Dr. Zemplenyi was found to

19

20  be a "Excellent Performer" in all of the seven included areas of general performance, including

21  "Professional Competence & Clinical Excellence", "Fulfills Professional Practice Responsibilities

22  in GHP Integrated Practice", "Superior Patient Experience: Patient Relationships", and "Work

23  Ethic/Productivity".   In the same Review, then-Chief Chris Diehl, M.D. commented that "she

24  works well to support departmental needs & patient care."  No improvements were required based

25  on this 2005 Review, or any of the prior positive Reviews Dr. Zemplenyi had received.   In

26  September 2006, David Caton, O.D., the Chief of Optometry in the Federal Way clinic, expressed

1   his approval for Dr. Zemplenyi's performance in that clinic.

2       65.     Dr. Zemplenyi had planned to continue her dedicated service to the Group Health

3   patient base.  In fact, in late 2006, Dr. Zemplenyi advised the Defendants that she planned to

4   continue working for Group Health for an additional ten years or more.

5

6       **D.     Dr. Zemplenyi's Reporting of Defendants' False Claims; Defendants'
            Harassment and Constructive Termination of Dr. Zemplenyi.**

7       66.     During her tenure with GHP, Dr. Zemplenyi gradually became aware of the

8   remarkable increase over the years in the number of cataract surgeries being performed by the

9   ophthalmology department.  Although she was chiefly focused on her own practice and the care of

10  her patients, she began to suspect that some of her colleagues were performing cataract surgeries

11  without adhering to appropriate guidelines and standards.

13      67.     In early 2005, Defendants advised the ophthalmology department that they *should*

14  *not* perform an additional pre-operative examination of cataract patients if they had been seen

15  within six months before surgery.   Instead Defendants instructed their ophthalmologists to

16  proceed directly into surgery.  This instruction was in direct violation of the Medicare/Noridian

17  guidelines requiring a pre-operative examination within three months before surgery.   Dr.

19  Zemplenyi expressed her opinion that this longer six month period without pre-operative

20  physician observation was too long, was a violation of Medicare requirements, and a potential

21  danger to patients.

22      68.     Throughout 2005 and 2006, Dr. Zemplenyi continued to discuss and object to

23  GHP physicians performing cataract surgeries outside Medicare compliance.  Despite her reports

24  and objections, Defendants consistently advocated performing surgeries as frequently as possible,

25  and ignored Dr. Zemplenyi's concern that cataract patients be closely observed before operating

Lybeck♦Murphy LLP
7525 SE 24ᵗʰ Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255  Fax 206-230-7791

1    and that alternative forms of treatment be explored.

2          69.    Despite her tenure and established policies to the contrary, in April 2006, Dr.

3    Zemplenyi was transferred to the Federal Way clinic.  Dr. Zemplenyi had worked in the Central

4

5    clinic for 18 years and had seniority over all but one of her colleagues in the Eastside clinic.

6    During the summer of 2006, Dr. Zemplenyi repeatedly requested a meeting with her supervisors

7    to discuss the reasons for her transfer to Federal Way.  No explanation for the transfer was

8    offered.

9          70.    After her retaliatory transfer to Federal Way, Dr. Zemplenyi took it upon herself to

10    investigate Defendants' non-compliance with the Medicare/Noridian criteria for cataract surgeries.

11    She reviewed files for several patients who had recently undergone cataract surgeries and learned

12

13    that Defendants had failed to meet the criteria in those cases.  In one case, cataract surgery had

14    been recklessly performed on a patient despite the patient's preexisting blindness in that surgical

15    eye.  The surgery had no possibility of restoring vision to the patient and should not have been

16    done.   In confidence, Dr. Zemplenyi contacted Group Health's Medicare Compliance Officer,

17    Kathy Harris, about her concerns.  Also in confidence, Ms. Harris requested that Dr. Zemplenyi

18    provide some of the patient files in question for Ms. Harris to review.  Dr. Zemplenyi did so in

19

20    August 2006.  Ms. Harris later independently determined that in each case she reviewed

21    Defendants had failed to adhere to the Medicare/Noridian criteria.   Defendants submitted

22    documents containing or reflecting false claims of medical necessity in connection with these

23    cases.

24          71.    In September 2006, Dr. Lee finally agreed to meet with Dr. Zemplenyi.  Dr.

25    Zemplenyi explained that there was a smaller patient population at the Federal Way clinic (and

26    therefore a lesser number of appropriate candidates for surgery).  She wanted to work at the

Lybeck❖Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA 98040-2334
206-230-4255  Fax 206-230-7791

1    Central clinic for one or two days per week.  Defendants declined her proposal and continued to

2    demand that she increase her RVUs by doing more surgeries.

3        72.    During the September 2006 meeting, Dr. Zemplenyi also raised with Dr. Lee her

4    concerns that GHP physicians were performing unnecessary and other cataract surgeries in

5    violation of the Medicare/Noridian criteria for Medicare reimbursement.  She explained that she

6

7    herself felt pressured to perform surgeries that were not indicated or consistent with the criteria.

8        73.    Following the meeting, Dr. Lee hurried to gather information about the

9    Medicare/Noridian criteria for cataract surgeries.  Dr. Lee asked an assistant to collect compliance

10   criteria.  During this time, at least one GHP ophthalmologist acknowledged that the Medicare

11   criteria were not being met or documented.

12

13       74.    Following the meeting with Dr. Zemplenyi in which she confronted Dr. Lee with

14   Defendants' violations of Medicare/Noridian criteria, Defendants began orchestrating a scheme to

15   discharge Dr. Zemplenyi from her employment with GHP.

16       75.    Dr. Lee quickly determined that Dr. Zemplenyi should be subject to a

17   "Performance Development Plan" (PDP).  A PDP is widely understood to be the last formal step

18   taken before an employee is subject to termination.  Given the fact that Dr. Zemplenyi had had no

19
     prior discussions with Defendants regarding the need for improving her performance, a PDP in
20
     these circumstances was an extreme event not sanctioned by GHP's personnel practices.
21

22       76.    It was not until October 2006, during her regular Annual Performance Review,

23   that Dr. Zemplenyi was informed that she would be receiving a PDP.  The only items mentioned

24   as deficiencies in her performance during the Annual Performance Review were the number of

25   patients she saw and the number of cataract surgeries she performed.  Dr. Zemplenyi again

26   explained that the relatively small patient population at the Federal Way clinic did not support an

Lybeck◆Murphy LLP
7525 SE 24ᵗʰ Street, Ste. 500
Mercer Island, WA 98040-2334
206-230-4255  Fax 206-230-7791

1   increase in necessary and appropriate cataract surgeries.  Dr. Lee warned that a PDP would be

2   issued, but advised Dr. Zemplenyi that she would have an opportunity to respond to it.

3       77.    After the October 2006 Annual Performance Review, the Group Health Medicare

4   compliance officer, Ms. Harris, disclosed to Dr. Zemplenyi that Dr. Lee had contacted her

5
    inappropriately, demanding that she identify Dr. Zemplenyi as the person who had complained
6
7   about Defendants' false claims.  Ms. Harris refused to confirm Dr. Lee's suspicion that Dr.

8   Zemplenyi was the ophthalmologist who reported the violations.

9       78.    Troubled  by  Dr. Lee's  inappropriate  contact  and  demand  for  confidential

10  information, Ms. Harris contacted her supervisor and expressed her concern that Dr. Lee would

11  retaliate against Dr. Zemplenyi.
12
13      79.    A  biennial  Medicare  compliance  audit  had  been  scheduled  for  fall  2006.

14  Following Dr. Zemplenyi's reports, the audit was abruptly postponed.  It is unclear whether the

15  audit has yet occurred.

16      80.    Meanwhile, months passed since Defendants threatened Dr. Zemplenyi with the

17  PDP.  Dr. Zemplenyi repeatedly inquired about the status of the PDP to no avail.  During this

18
    period, Defendants had no communications with Dr. Zemplenyi about her performance and
19
20  offered no input about how it should improve.

21      81.    During the long delay in providing the PDP, Dr. Zemplenyi was subjected to

22  extensive  concerted  efforts  to  effectuate  her  discharge.   Defendants  gathered  any  available

23  information that could be used as a pretext to justify adverse employment actions against her.  Dr.

24  Lee and other GHP employees acted in concert to devise baseless criticisms of Dr. Zemplenyi's

25  performance.  During these efforts, for months Defendants continuously drafted and redrafted a

26  PDP.

1     82.    Defendants even went so far as to revise long standing Workload Guidelines in the

2    effort to silence and terminate Dr. Zemplenyi.  New Guidelines were adopted allowing any

3    employee (even with nearly 20 years' tenure) subject to a PDP to be summarily terminated during

4    a "reduction in force".

5

6     83.    Dr. Zemplenyi became increasingly aware of Defendants' efforts to silence and

7    discharge her.  Dr. Zemplenyi was singled out and every facet of her professional practice was

8    examined, whether or not it was germane to the Annual Performance Review.  Dr. Zemplenyi was

9    subjected to considerable emotional and mental distress, anxiety, and fear for her professional

10   standing, reputation and financial security.

11

12     84.    In July 2007, over nine months after her 2006 Annual Performance Review,

13   Defendants first presented Dr. Zemplenyi with the PDP.  The PDP raised a host of issues that had

14   never been mentioned before.  Defendants never allowed Dr. Zemplenyi to have an opportunity to

15   respond to the PDP.  Instead, it became a permanent part of her employment file immediately.

16     85.    During this time, Ms. Harris in Medicare Compliance retired.  The new Group

17   Health compliance officer was aware of Dr. Lee's retaliation, and suggested that Dr. Zemplenyi

18   contact the Human Resources Department.  After Dr. Zemplenyi reported Defendants' harassment

19   and retaliation, Defendants hired an "independent" investigator to look into Dr. Zemplenyi's

20   complaint.  The investigator was in fact not "independent" but was a former employee of Group

21   Health who maintained close personal and business relationships with Defendants' executive and

22   managerial employees.  In performing her investigation, the investigator worked closely with

23   Defendants, while declining to pursue leads and interview witnesses suggested by Dr. Zemplenyi.

24   The investigator submitted her report to Defendants in October 2007 and not to Dr. Zemplenyi.

25   The report contained numerous self-serving and even self-contradictory findings.  Despite the

26

1  Group Health compliance officers' earlier determinations, this report concluded that Dr.

2  Zemplenyi's complaints were insubstantial.

3      86.   Even though the PDP was issued with the pretext of allowing Dr. Zemplenyi's

4  performance to improve, in reality Defendants had determined that Dr. Zemplenyi would be

5

6  silenced and terminated.  Dr. Lee secretly conformed this in an email to another GHP doctor

7  seeking his help in devising an "exit plan" for Dr. Zemplenyi.

8      87.   With no opportunity to respond to the PDP as pretext for her dismissal, Dr.

9  Zemplenyi was denied her right to internal appeal and review of Defendants' adverse actions

10  against her.  She was subjected to continuing and relentless scrutiny and all manner of gossip and

11  innuendo by her colleagues and supervisors.   Because of the pervasive harassment and

12  persecution, Dr. Zemplenyi suffered serious emotional and mental distress.  In this environment

13

14  she could no longer appropriately care for GHP patients and she was constructively discharged in

15  November 2007 after nearly 20 years of service.

16                          **FIRST CAUSE OF ACTION**

17            **Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)**
18                              **Against all Defendants**

19      88.   Plaintiffs re-allege and incorporate herein by reference paragraphs 1-87 above.

20      89.   Defendants knowingly presented or caused to be presented to an officer, employee

21  or agent of the United States false or fraudulent claims for payment by the Medicare program, in

22  violation of 31 U.S.C. § 3729(a)(1).

23

24      90.   The United States paid such false or fraudulent claims because of the acts of

25  Defendants.

26

AMENDED COMPLAINT - 26

91.     By reason of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment.  In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

### SECOND CAUSE OF ACTION

**Violations of the False Claims Act, 31 U.S.C. § 3729(a)(2)**
**Against all Defendants**

92.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1-91 above.

93.     As set forth above, in connection with the foregoing scheme, Defendants knowingly made, used or caused to be made or used, false records and statements to get false or fraudulent claims paid or approved by the United States, in violation of 31 U.S.C. § 3729(a)(2).

94.     The United States paid such false or fraudulent claims because of the acts of Defendants.

95.     By reason of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(2), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment.  In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

### THIRD CAUSE OF ACTION

**Violations of the False Claims Act, 31 U.S.C. § 3729(a)(3)**
**Against all Defendants**

96.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1-95 above.

97.     As set forth above, in connection with the foregoing scheme, Defendants conspired to get false or fraudulent claims paid or approved by the United States, in violation of 31 U.S.C. § 3729(a)(3).

AMENDED COMPLAINT - 27

98.     The United States paid such false or fraudulent claims because of the conspiratorial acts of Defendants.

99.     By reason of the conspiratorial acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(3), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment.  In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## FOURTH CAUSE OF ACTION

### Violations of the False Claims Act, 31 U.S.C. § 3730(h)
### Against all Defendants

100.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1-99 above.

101.    As set forth above, in connection with the foregoing scheme, Defendants conspired to get false or fraudulent claims paid or approved by the United States, in violation of the False Claims Act.

102.    As set forth above, Eva Zemplenyi, M.D. was threatened, harassed, discriminated against and ultimately discharged by Defendants as a result of her performing lawful acts in furtherance of this action, including her investigating and refusing to participate in Defendants' wrongful acts and conduct in violation of the False Claims Act.  At all relevant times, Eva Zemplenyi, M.D. was engaging in activity that was protected by the False Claims Act. Defendants, knowing that Eva Zemplenyi, M.D. was engaging in such activity, discriminated against her because of it.

103.    Defendants can offer no justification for their threatening, harassing, discriminating against, and discharging Eva Zemplenyi, M.D.

AMENDED COMPLAINT - 28

104.   In order to redress the harms she has suffered as a result of the acts and conduct of Defendants in violation of 31 U.S.C. § 3730(h), Eva Zemplenyi, M.D. is entitled to damages including two times the amount of back pay, interest on back pay, and compensation for any special damage, including emotional distress, and any other damages available by law including litigation costs and reasonable attorneys' fees.

## FIFTH CAUSE OF ACTION

### Common Law Fraud
### Against all Defendants

105.   Plaintiffs re-allege and incorporate herein by reference paragraphs 1-104 above.

106.   As set forth above, in connection with the foregoing scheme, Defendants submitted documents containing or reflecting false claims of medical necessity for surgical procedures.   Defendants knew that their express and implied representations that the surgical procedures were medically necessary and appropriate were false.

107.   These misrepresentations were material. Defendants' false representations that the medical services were medically necessary and appropriate were prerequisites for payment or reimbursement by Medicare.

108.   Defendants knew that the United States would rely, and intended the United States to rely, on these false representations.

109.   The United States justifiably relied upon false representations submitted or caused to be submitted by Defendants.

110.   By reason of Defendants' fraud, the United States suffered damages in an amount to be determined at trial.

AMENDED COMPLAINT - 29

## SIXTH CAUSE OF ACTION

### Unjust Enrichment
### Against all Defendants

111.   Plaintiffs re-allege and incorporate herein by reference paragraphs 1-110 above.

112.   As set forth above, in connection with the foregoing scheme, Defendants received from the United States funds to which they were not entitled, including all amounts paid in response to, or in reliance upon, false or fraudulent claims for surgeries that were inappropriately documented and/or unnecessary.

113.   Defendants benefited from those funds.   Had the misconduct of Defendants described herein been known to the officers, employees or agents of the United States responsible for adjudicating and evaluating bids for, and adjustments to, Medicare payments, the claims presented and/or caused to be presented by Defendants would not have been paid.

114.   Consequently, Defendants received money, directly and indirectly, to which they were not entitled.   Defendants have therefore have been unjustly enriched and the attendant circumstances dictate that, in equity and good conscience, the money should be returned to the United States.

## SEVENTH CAUSE OF ACTION

### Wrongful Discharge in Violation of Public Policy
### Against all Defendants

115.   Plaintiffs re-allege and incorporate herein by reference paragraphs 1-114 above.

116.   As set forth above, in connection with the foregoing scheme, Defendants conspired to get false or fraudulent claims paid or approved by the United States, in violation of the False Claims Act and common law.

Lybeck♦Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA 98040-2334
206-230-4255   Fax 206-230-7791

117.   Washington State has a clear public policy against the commission of acts which violate federal and state laws, and against conduct which discourages citizens from investigating and reporting such unlawful acts.

118.   As set forth above, Eva Zemplenyi, M.D. was threatened, harassed, discriminated against and ultimately discharged by Defendants as a result of her refusing to commit and/or participate in unlawful acts; as a result of her exercising her legal rights and privileges; as a result of engaging in investigative activity which is protected by the False Claims Act; and as a result of her engaging in whistleblowing activity.

119.   Discouraging Eva Zemplenyi, M.D. and others from refusing to commit and/or participate in wrongful acts and conduct in violation of the False Claims Act and common law, exercising their legal rights and privileges, engaging in investigative activity which is protected by the False Claims Act, and engaging in protected whistle blowing activity would jeopardize the State's clear public policy against the commission of unlawful acts.

120.   Defendants can offer no justification for their threatening, harassing, discriminating against, and discharging Eva Zemplenyi, M.D.

121.   In order to redress the harms she has suffered as a result of her wrongful discharge by Defendants, Eva Zemplenyi, M.D. is entitled to damages including back pay, interest on back pay, front pay, and compensation for any special damage, including emotional distress, and any other damages available by law including litigation costs and reasonable attorneys' fees.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand and pray that judgment be entered in their favor and against Defendants jointly and severally as follows:

AMENDED COMPLAINT - 31

1.      For money damages in the amount of the United States' damages, payments, other losses, and civil penalties, as are allowable under the False Claims Act, for each false or fraudulent claim, including an award to Dr. Zemplenyi as the *qui tam* Plaintiff under 21 U.S.C. § 3730, and all costs of this civil action;

2.      For money damages to redress the harms personally suffered by Eva Zemplenyi, M.D., including two times the amount of back pay, interest on back pay, front pay, and compensation for all special damages available by law, including emotional distress, litigation costs, and reasonable attorneys' fees;

3.      For money damages in the amount which the Defendants obtained from the United States by fraud;

4.      For money damages in the amount by which the Defendants were unjustly enriched at the expense of the United States;

5.      For interest, costs, reasonable attorneys' fees, and other expenses; and

6.      For all such further relief as the Court may deem just and proper.

### Jury Demand

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury.

Respectfully submitted this 25 day of February, 2010.

LYBECK MURPHY, LLP

By: _____
Lory R. Lybeck (WSBA #18125)
Benjamin R. Justus (WSBA #38855)
Attorneys for Plaintiffs

AMENDED COMPLAINT - 32