1
2
3
4
5
6
7
8
9
10

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

11
12

| | |
|---|---|
| United States of America, *ex rel.* Eva Zemplenyi, M.D., and Eva Zemplenyi, M.D., individually, | No. C-09-0603-RSM |
| Plaintiffs, | **SECOND AMENDED COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT** |
| v. | |
| Group Health Cooperative, Group Health Permanente, Group Health Options, Inc., KPS Health Plans, Group Health Northwest, | |
| Defendants. | |

**INTRODUCTION**

1.      This is an action against Defendants for damages and civil money penalties, and other monetary relief, under the False Claims Act, 31 U.S.C. §§ 3729-3732 (FCA).

2.      A person with knowledge of an FCA violation (relator) may bring an action in federal district court on behalf of the United States: a *qui tam* action.  The relator in this case is Eva Zemplenyi, M.D., who submitted this *qui tam* action for filing under seal on or about April

**SECOND AMENDED COMPLAINT** - 1

30, 2009.  The Court ordered the matter unsealed on July 15, 2009.

3.     This action arises out of false claims and Medicare payments made for unnecessary medical services performed by Defendant Group Health Cooperative and its affiliated entities.  In a typical FCA case of Medicare fraud in a "fee-for-service" arrangement, a bill for an unnecessary medical service can be directly traced to a payment for that individual service.  Here, the false claims and Medicare payments are less direct but readily identifiable and actionable. Charges for specific unnecessary cataract surgeries done on individual patients and related diagnoses were included in annual bid and periodic adjustment documents, along with charges and diagnoses related to other medical services for other patients.  Inclusion of the fraudulent and unnecessary surgeries resulted in Defendants receiving higher monthly payments from Medicare than Defendants were properly entitled to.  While Defendants' fraudulent bid reimbursement scheme may be complex, its essence is the same as in more common FCA cases: the submission of false documentation reflecting unnecessary medical services by Defendants resulting in millions of dollars in undeserved payments from the U.S. Government treasury.  As set forth below, this type of fraud is not new.  Other federal courts have permitted actions for fraud within "capitated" Medicare payment systems.

4.     Group Health executives and chief physicians devised a scheme to increase Group Health's revenue from Medicare by increasing the number of cataract surgeries in violation of its own policies, Medicare guidelines, and other laws and regulations intended to prevent abuse, fraud and waste.  A great number of these surgeries were performed without a showing of medical benefit or necessity.  Defendants prepared numerous false bid documents, data reports and certifications containing, reflecting or based upon the alleged "cost" of unnecessary and medically inappropriate cataract surgeries that were submitted to Medicare in connection with Group

**SECOND AMENDED COMPLAINT** - 2

Lybeck◊Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

1    Health's "Medicare Advantage" plans, ultimately resulting in fraudulently inflated "capitated"

2    payments from Medicare.

3        5.    In furtherance of the false claims, explicit and implicit directives were made by

4    management-level physician chiefs in the ophthalmology and optometric departments and by

5    other executives in Defendants' organization.    Through these directives, management

6    communicated to health care providers including Plaintiff Eva Zemplenyi, M.D. the

7    organization's plan to increase revenue by performing increasing numbers of cataract surgeries on

8    its patient population without regard for the appropriate care for any individual Group Health

9    patient or member.    The directive to do more surgeries was motivated solely by a desire for

10    financial gain, and ignored federal regulations, the independent judgment of physicians, and

11    concerns for patient safety and well-being.

12

13        6.    During one data period, Group Health promoted a 100% increase in cataract

14    surgeries.    This increase was grossly disproportionate to the growth of the Group Health patient

15    population generally.

16

17        7.    At the same time that Group Health was promoting inappropriate surgeries, it also

18    shifted otherwise appropriate services and procedures away from Group Health ophthalmologists

19    and toward lesser qualified optometric physicians.    This shift was also intended to cause

20    ophthalmologists to perform more lucrative surgical procedures whether or not appropriate.    As an

21    additional consequence, Group Health optometric physicians performed medical services beyond

22    the appropriately licensed scope of their practice.

23

24        8.    When documented cases of unwarranted surgical procedures were reported within

25    Group Health to Group Health's Medicare compliance staff, compliance officers recognized that

26    unnecessary cataract surgeries were being performed and that Medicare was paying for services in

Lybeck◆Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

violation of Medicare and Group Health regulations.

9.      Michael Lee, M.D., the Chief of Group Heath's ophthalmology department, learned of Dr. Zemplenyi's concerns and reports about unnecessary surgeries.  Rather than stopping these surgeries, Dr. Lee confronted the Medicare compliance officer and demanded to know the identity of the individual who had reported the abuse.  He specifically demanded to know whether Dr. Zemplenyi had made the report.  The Medicare compliance officer feared that Dr. Lee may seek to retaliate against Dr. Zemplenyi and she reported her concerns to Dr. Zemplenyi.  Her concerns proved well founded.  After her report of abuse, Dr. Zemplenyi faced months of hostility from Dr. Lee and others.  She was ultimately constructively discharged and forced to quit her nearly 20-year employment as a physician at Group Health after reporting the scheme.

10.     Not only did Defendants' actions harm Dr. Zemplenyi personally and financially, their actions also defrauded the U.S. Treasury and the taxpayers of millions of dollars.  Group Health's actions also placed at risk hundreds of vulnerable patients who underwent ill-advised and inappropriate surgeries.

## JURISDICTION AND VENUE

11.     This action arises under the False Claims Act, as amended, 31 U.S.C. §§ 3729-3733.  This Court has subject matter jurisdiction over the claims brought under the False Claims Act pursuant to 31 U.S.C. § 3730(a), 28 U.S.C. § 1331, 1345, and the Court's general equitable jurisdiction.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and 31 U.S.C. § 3732(a).  31 U.S.C. § 3732(a) provides that in actions brought under 31 U.S.C. § 3730 venue is proper in any judicial district where one or more Defendants can be found, where they reside,

1   where they transact business, or where any act proscribed by 31 U.S.C. § 3729 occurred.

2   Defendants continuously transacted business in this District at all relevant times.  In addition, a

3   substantial number of the events giving rise the claims set forth in this Complaint occurred in this

4   District.

5
                              **THE PARTIES**
6

7       13.     Plaintiffs are the United States of America (United States or Government) and Eva

8   Zemplenyi, M.D.  The United States filed this Complaint on behalf of the Department of Health

9   and Human Services (HHS) and the Centers for Medicare and Medicaid Services (CMS),

10  formerly known as the Health Care Financing Administration (HCFA), on behalf of the Medicare

11  program.

12
        14.     Defendant Group Health Cooperative claims to be "a consumer governed non-
13
    profit healthcare system."  It claims to be governed by "an independent board of trustees
14
    comprised of eleven consumers elected by Group Health's voting members."  However, in 2008
15

16  Group Health took in over $2.76 billion dollars in total revenues, including $647,409,000.00 from

17  taxpayer funds.

18
        15.     Defendant Group Health Permanente (GHP) is a corporation under exclusive
19
    contract to provide care in Group Health Cooperative-owned or -operated facilities for patients of
20
    Group Health Cooperative.  GHP works in close coordination with management of Group Health
21
    Cooperative.  At all relevant times except where mentioned, Dr. Zemplenyi was an employee of
22

23  GHP.

24
        16.     Defendant Group Health Options, Inc., KPS Health Plans and Group Health
25
    Northwest were and/or are wholly-owned subsidiaries of Group Health Cooperative.  These
26
    subsidiaries provide a variety of heath care plans for groups and individuals throughout the State

**SECOND AMENDED COMPLAINT** - 5

1   of Washington.

2   17.   At all relevant times Defendants Group Health Cooperative, GHP, Group Health

3   Options, Inc., KPS Health Plans and Group Health Northwest were and/or continue to be

4   organized under the laws of Washington.  They are each based in Seattle, Washington.

## BACKGROUND

**A.   False Claims Act.**

18.   The FCA provides, in pertinent part:

> (a)  Any person who (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval; (2) knowingly makes, uses or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government; (3) conspires to defraud the Government by getting a false or fraudulent claim paid or approved by the Government; … or (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government,
>
> * * *
>
> is liable to the United States Government....
>
> (b)  For Purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729.

31 U.S.C. § 3730(h) provides:

> Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated

Lybeck◆Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

1  against in the terms and conditions of employment by his or
2  her employer because of lawful acts done by the employee on
   behalf of the employee or others in furtherance of an action
3  under this section, including investigation for, initiation of,
   testimony for, or assistance in an action filed or to be filed
4  under this section, shall be entitled to all relief necessary to
   make the employee whole. Such relief shall include
5  reinstatement with the same seniority status such employee
   would have had but for the discrimination, 2 times the
6  amount of back pay, interest on the back pay, and
   compensation for any special damages sustained as a result
7  of the discrimination, including litigation costs and
   reasonable attorneys' fees. An employee may bring an action
8  in the appropriate district court of the United States for the
   relief provided in this subsection.
9  ***

10

11    **B.    The Medicare Advantage Program, Bidding, Risk Adjustment and Payments.**

12

13       19.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the

14  Medicare program, to pay for the costs of certain healthcare services.  Entitlement to Medicare is

15  based on age, disability or affliction with end-stage renal disease.  *See* 42 U.S.C. §§ 426, 426A.

16       20.    The Department of Health and Human Services (HHS) is responsible for the

17  administration and supervision of the Medicare program.  The Center for Medicare and Medicaid

18  Services (CMS), formerly known as the Health Care Financing Agency (HCFA), is an agency of

19  HHS and is directly responsible for the administration of the Medicare program.

20

21       21.    Part A of the Medicare Program authorizes payment for institutional care,

22  including hospital, skilled nursing facility and home health care. *See* 42 U.S.C. §§ 1395c-1395i-4.

23   Medicare's Supplementary Medical Insurance, Part B, covers physicians' services, outpatient

24  care, and other services not covered by Part A, including outpatient surgeries and procedures. *See*

25  42 U.S.C. §§ 1395j-1395w-4.  Generally, medical providers offering services under Parts A and B

26  are paid a reimbursement from CMS for each service rendered to Medicare beneficiaries, in a

Lybeck◇Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

1    "fee-for-service" arrangement.

2        22.    With the passage of the Balanced Budget Act of 1997, Medicare beneficiaries

3    were given the option to receive their Medicare benefits through comprehensive health insurance

4    plans, instead of through the original Medicare Parts A and B.  These programs were originally

5    known as "Medicare+Choice" or "Part C" plans. *See* 42 U.S.C. §§ 1395w-21-1395w-29.

6    Pursuant to the Medicare Prescription Drug, Improvement, and Modernization Act of 2003

7    (Medicare Modernization Act), Medicare+Choice plans were subject to the addition of

8    prescription drug coverage and became known as "Medicare Advantage" (MA) plans.

9        23.    Health Maintenance Organizations (HMOs) such as Defendant Group Health

10   Cooperative have long been afforded a special role in delivering services to Medicare

11   beneficiaries.  In 1982, HMOs were allowed to "package" all patient services required for

12   enrolled beneficiaries in exchange for a per capita or "capitated" payment per patient, then set

13   at 95% of the total fee-for-service costs per capita in the relevant U.S. county.  HMOs are now

14   offering various MA plans including all medical benefits for enrolled member beneficiaries,

15   and other advertised supplemental benefits.  Pursuant to contracts with CMS, organizations

16   offering these plans are paid by CMS on a capitated basis, typically in a lump sum per member,

17   per month.

18       24.    Contrary to the expectation that MA plans would increase competition and help

19   drive down Medicare spending by increasing efficiencies, actual payment levels are significantly

20   above those for traditional fee-for-service arrangements.  The plan to recognize efficiencies and

21   pay 95% of fee-for-service costs has been sadly perverted.  It was estimated that in 2009

22   payments to organizations offering MA plans ("MA organizations" or MAOs) such as Defendants

23   would cost CMS 113% of the cost of providing the same benefits under the traditional fee-for-

Lybeck◆Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

1   service system.

2       25.     This 18% increase in charges results in part from the fact that Defendants and

3   other MAOs are allowed to estimate billing charges based on past charges and anticipate

4   increases in services. Under a bidding mechanism established by the Medicare Modernization

5   Act, each MAO offering an MA plan submits to CMS a bid that represents the payment it

6   anticipates for providing all traditional Medicare Part A and B benefits to plan enrollees during a

7   forthcoming contract year.   The bid contains all the MAO's estimated costs, including

8   administrative expenses, and its profit margin. *See* 42 C.F.R. §422.254(b).

9

10      26.     The bid is calculated and submitted in accordance with a "Medicare Advantage

11  Bid Pricing Tool."   The Bid Pricing Tool requires cost data from a base period organized

12  according to **benefit service categories**, including such services as cataract surgical

13  procedures.   These data are required to provide a current best estimate of incurred costs on the

14  basis of actual historical experience.   The annualized utilization per thousand enrollees for each

15  of the **benefit service categories** during the base period is included in the calculation and

16  claim.   Utilization, average unit cost, and other measurements, adjustments and assumptions

17  are employed to make a projection of the total costs for services billed to Medicare for the

18  forthcoming contract year.   This projection is presented to CMS via the Bid Pricing Tool and

19  certified by actuaries employed by MAOs like Defendants, or their third-party consulting firms.

20  By law, the MAO's "bid amount…[must] equitably reflect[] the plan's estimated revenue

21  requirements for providing the benefits under that plan…" 42 C.F.R. §422.256(b)(2),

22

23

24      27.     The bid submitted by each plan is compared with a "benchmark" rate that is

25  periodically determined by CMS for each U.S. county.   Each MAO such as Defendants

26  receives from Medicare a payment rate equal to the benchmark rate if its bid is equal or greater

**SECOND AMENDED COMPLAINT** - 9

to the benchmark rate. 42 C.F.R. §422.304.  Because benchmarks--intended to incentivize the offering of MA plans in underserved areas--are often set well above what it costs Medicare to provide benefits to similar beneficiaries under the traditional fee-for-service system, MA plan payment rates greatly exceed comparable fee-for-service spending.

28.     Beginning in 2004, CMS began to phase in a system of adjusting the per-patient capitation payments for individual MA plan enrollees based on the CMS Hierarchical Category Condition (CMS-HCC) risk adjustment model. 42 C.F.R. §422.308(c),(e).  "Each MA organization must submit to CMS (in accordance with CMS instructions) the data necessary to characterize the context and purposes of each item and service provided to a Medicare enrollee by a provider, supplier, physician, or other practitioner." 42 C.F.R. §422.310(b).  These data are typically submitted to CMS via specialized computer software such as the Palmetto Front-End Risk Adjustment System (FERAS), the CMS Risk Adjustment Processing System (RAPS), or substantially similar software.  Based on these data submissions, CMS evaluates each patient's demographic characteristics, diagnoses, and treatments in inpatient, outpatient and physician settings.  Generally, beneficiaries diagnosed with more illnesses and receiving more services would rate a higher capitation payment to their MAO, likely in excess of the benchmark rate.

29.     Due to the nature of the bidding and risk adjustment mechanisms, a number of claims or data submitted reflecting services rendered in one plan year increases the amounts of capitation payments for enrolled beneficiaries in current or subsequent plan years.  A substantial number of false claims or data dramatically increases the capitation payments.

30.     MAOs like Defendants regard information concerning their bid submissions and capitation payments from CMS as "proprietary" and refuse to make this public funding information available to the public.  Surprisingly, CMS generally does not oppose this secrecy

Lybeck◆Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255  Fax 206-230-7791

1    and has indicated that it will not disclose MAO bid and payment information in the absence of

2    court orders.

3        31.      Partly because of this secrecy and the complexity of false payment schemes, the

4    U.S. Government has only recently recognized the potential for false claims and fraud within

5    the Medicare Advantage capitated payment system.  Complaints have recently been filed by the

6    U.S. Attorney for the Southern District of Florida targeting fraud and false claims perpetrated

7

8    in connection with MA plans. *See U.S. v. D&A Therapy Center, et al*, Case No. 08-CV-21954-

9    KMM (S.D. Fla.); *U.S. v. Huarte, et al*, Case No. 09-CR-20523-PAS (S.D. Fla.)

10       **C.      Requirements of Medical Necessity for Surgical Procedures.**

11       32.      In addition to other limitations on coverage, Medicare covers only those services

12
     that are "reasonable and necessary for the diagnosis or treatment of illness or injury… ." 42
13
14   U.S.C. § 1395y(a)(1)(A).  As a condition of their contracts with CMS, all MAOs are expressly

15   required to adhere to the False Claims Act and other "[f]ederal laws and regulations designed to

16   prevent or ameliorate fraud, waste, and abuse..." 42 C.F.R. §422.504(h)(1).  In turn, MAOs must

17
     also ensure that any agreements delegating responsibilities to contractors and related entities
18
     specify that such contractors and related entities must also comply with all applicable Medicare
19
20   laws, regulations and CMS instructions. 42 C.F.R. §422.504(i)(4)(v).

21       33.      As a condition of receiving payment from CMS, MAOs must certify the accuracy,

22   completeness or truthfulness of all data submitted to CMS that are used to determine the amount

23   of payments to be received. 42 C.F.R. §422.504(l).  The certification must be made by the

24   organization's CEO, CFO or an individual delegated the authority to sign of the officer's behalf.

25       34.      Further, the risk adjustment data submitted by MAOs like Defendants must

26   "conform to the requirements for equivalent data for Medicare fee-for-service when appropriate,

Lybeck◆Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255  Fax 206-230-7791

1   and to all relevant national standards." 42 C.F.R. §422.310(d).  These data must also account

2   separately for each physician or other practitioner that would be permitted to bill separately under

3   the original Medicare program, even if they participate jointly in the same service. 42 C.F.R.

4   §422.310(c)(2).

5

6         35.     At all times relevant to this action, CMS contracted with Noridian Administrative

7   Services, LLC ("Noridian") to administer Medicare claims in the region where Defendants

8   operate.  Pursuant to its contract and applicable regulations, Noridian examined claims submitted

9   by health care providers in the local area and determined whether to accept or deny claims.

10         36.     In coordination with Medicare, Noridian has developed specific criteria for

11   determining whether cataract surgery is warranted.  The criteria define the initial pre-operative

12   clinical evaluation of a patient that is necessary to justify cataract surgery for purposes of

13   Medicare coverage.  Medicare provides coverage for cataract surgery only when it is reasonable

14   and necessary for the treatment of beneficiaries and only if it is documented that each beneficiary

15

16   meets all of the following criteria:

17         1.     The patient has undergone standardized formal measure of his or her

18             visual functional status which suggest it can be improved commensurate the risk

19

20             of cataract surgery;

21         2.     The patient has impairment of visual function due to cataract resulting in:

22             a.     Decreased ability to carry out activities of daily living;

23             b.     Snellen visual acuity of 20/50 or worse, unless:

24                  i.     The patient is able to carry out activities of daily living

25                    with other non-operative means,

26                  ii.     The operative risk is not commensurate with the potential

**SECOND AMENDED COMPLAINT** - 12

Lybeck◈Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

benefit to the patient, and

        iii.     Diabetic retinopathy rather than cataract is the limiting factor of visual function;

3.    The patient has been educated about the risks and benefits of cataract surgery and has provided informed consent; and

4.    The patient has undergone an appropriate pre-operative ophthalmologic examination, generally including Snellen acuity and refraction on both eyes with recorded results.

37.    In addition to these criteria, Noridian and Medicare also require that there be a *maximum* interval of three months between the pre-operative examination and the date of surgery.  This interval is intended to allow for observation of significant changes in the patient's health or vision before surgery is performed.

38.    Noridian and Medicare also forbid performing cataract surgery on both eyes on the same day because of the potential for bilateral visual loss.  They require that the patient and the physician have sufficient time to assess the results of the first eye surgery to determine both the need and appropriate timing for potential surgery on the second eye.  Under Medicare/Noridian regulations, surgery is contraindicated and should not be performed if it will not improve visual function.

39.    At all times relevant to this action, when service providers sought reimbursement for medical services from Noridian, they were required to complete reimbursement claim forms and submitted them to Noridian.  Form CMS-1500, sometimes called the "AMA form," is the basic form prescribed by CMS for Medicare claims.  Medicare requires medical providers to accurately identify on the claim form the services they perform by using the codes contained in

Lybeck◆Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

the American Medical Association's Current Procedural Terminology manual, which are commonly referred to as "CPT codes." The claim forms also require that the diagnosis code accurately identify the medical diagnosis or patient's condition requiring the medical procedure. In addition, the health care provider is required to sign the form and state that "I certify that the services shown on this form were medically indicated and necessary for the health of the patient…"

40.    Forms are submitted electronically or by mail.  Before Noridian and other Medicare administrators will accept electronically submitted claims, medical providers must agree in writing that they will be responsible for the accuracy of the Medicare claims submitted on their behalf and that all claims submitted under their provider identification numbers would be accurate, complete and truthful.

41.    Under traditional Part A and B fee-for-service arrangements, upon receiving a Medicare claim form, Noridian, applies its own and CMS policies and determines whether the procedure is documented as medically necessary and whether the claim otherwise qualifies for payment.  Noridian also computes the proper amount of reimbursement for qualified claims.

42.    Providers rendering services to beneficiaries under MA plans in the region where Defendants operate typically complete and submit the same or similar forms as those submitted to Noridian for Part A and B claims.  Defendant Group Health Cooperative specifically required its contracted providers, including GHP physicians, to account for all diagnosis and procedure data that is required in the CMS-1500 form, advising them that claims made under its MA plans were "subject to all Medicare billing requirements."

### FACTS COMMON TO ALL CLAIMS

**A.    Motivation for Profit in the Group Health Cooperative System.**

Lybeck◆Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

43.     Despite Group Health's status as a "non-profit organization," its top officers and managing physicians are highly compensated.  For 2008, Group Health reported to the Internal Revenue Service that its president and CEO Scott Armstrong's compensation exceeded $1 million.  Rick D. Woods, Group Health's executive vice president and general counsel, reported compensation exceeding $500,000.  Group Health reported that at least a dozen additional officers earned in excess of $250,000 per year during 2008.  These officers reportedly also received tens of thousand dollars in additional benefits during the same year.

44.     By contrast, the board of trustees who Group Health claims to be "governed by" earned paltry sums.  Trustee chair Jerry F. Campbell was paid only $11,875 for his services in 2008, and the remainder of the board members were paid less than $8,000 each.

45.     In addition to treating patients, Group Health and GHP physicians also commonly have executive and managerial roles as well.  These physicians' salaries are based in significant part upon their administrative versus medical functions.  Many physician/administrators receive promotions through the executive ranks resulting in higher compensation based on the productivity of the physicians operating under their administrative control, measured largely by "Relative Value Units" that are assigned to each service rendered by the group or clinic.  In simplest terms, the more Relative Value Units compiled, the greater the charges to Medicare.

46.     Group Health executives, clinic managers, clinic staff and managing physicians are also paid incentives and bonuses based on performance and productivity.  Assessments of productivity for purposes of financial incentives are also evaluated primarily on "Relative Value Unit" calculations.

**SECOND AMENDED COMPLAINT** - 15

**B.      Group Health's Scheme to Increase Relative Value Units and Revenue via False Claims.**

47.      In order to better facilitate orderly and consistent billing and payment of claims for health care services, between 1985 and 1992 Medicare created and implemented the Resource-Based Relative Value Scale (RBRVS).   One of the central components of this system is the Relative Value Unit (RVU).   RVUs are nonmonetary, numeric values that Medicare has devised to represent the relative amount of physician time, resources, and expertise needed to provide various services to patients.

48.      Medicare bases RVUs on three components: (1) physician work (which takes into account the physician's expertise and time spent in preparation and follow-up documentation of each service performed); (2) practice expense (which accounts for the cost to operate a medical practice); and (3) professional liability insurance expense (which estimates the relative risk of services).  The amount of compensation a provider receives from Medicare for a service depends heavily on the RVUs assigned to that service.

49.      Typically, **surgical procedures are afforded a high number of RVUs**, especially compared with other physician services, such as office visits, examinations, or testing.  For example, according to the American Medical Association's 2008 data for the Seattle region, the most commonly performed cataract surgery, extracapsular cataract removal with insertion of intraocular lens prosthesis (CPT code 66984), was worth 17.68 RVUs.  By contrast, a comprehensive medical examination and evaluation of an existing patient by an ophthalmologist (CPT code 92014) was worth only 1.91 to 2.84 RVUs.  An ophthalmologist performing a cataract surgery would be considered <u>more than six times more productive and profitable</u> while in surgery than while performing necessary pre- or post-operative clinical

Lybeck◊Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

1    examinations.

2        50.     In connection with surgical procedures, health care facility providers such as

3    Defendants typically also charge a "facility fee."  This fee is ostensibly related to costs incurred by

4    the facility where surgeries are performed.  According to Medicare and Noridian guidelines,

5    claiming a facility fee in connection with cataract surgery is subject to the same requirements of

6    medical necessity as the surgery itself, including the specific criteria described in detail above.

7

8        51.     Due to the requirement that bids for payment reflect an MAO's actual "costs"

9    experienced during the base period year (and the requirement that MAOs submit data reports to

10   CMS for purposes of risk adjustment reflecting actual treatments and diagnoses for its enrolled

11   population), performing additional surgical procedures potentially results in significantly

12   increased capitated payments, even more so than office visits, examinations, or testing.  This

13   potential increase in payments, along with the relatively fixed cost for MAOs like Defendants

14   to provide a given medical service, creates a direct profit motive to render high-RVU services

15   more frequently, including inappropriate cataract surgeries.

16

17       52.     Historically, Medicare billing for services related to the treatment of cataracts has

18   been subject to widespread abuse by health care providers.  The Office of the Inspector General

19   for HHS prepared a March 1986 report following a study of Medicare reimbursement for

20   cataract surgeries in California, New York, Florida, Pennsylvania, Texas and Washington.  The

21   report noted that the House Subcommittee on Health and Long Term Care projected that fraud,

22   waste, and abuse related to cataract surgeries cost the taxpayers over $2 billion in 1985.  The

23   Inspector General concluded that, even putting aside medically inappropriate surgeries,

24   unnecessary costs incident to Medicare claims for these surgeries totaled over $500 million per

25   year.  A subsequent report by the Inspector General specifically found that Medicare had spent

26

**SECOND AMENDED COMPLAINT** - 17

1    $29.4 million in 1988 for medically unnecessary cataract surgeries.

2        53.    About one decade after this potential for abuse was first identified, Defendants

3    implemented their own plan to increase Medicare revenues from unnecessary cataract surgeries.

4    Beginning in 1994, Defendants dramatically increased the number of surgeries performed by

5    ophthalmologists.  Just within the Central Ophthalmology clinic in Seattle, there was an increase

6    from 738 surgeries in 1993, to 916 surgeries in 1994, 1,048 surgeries in 1995, 1,241 surgeries in

7

8    1996, and 1,312 surgeries in 1997.  After a slight decline in 1998, there were 1,365 surgeries in

9    1999 and 1,499 surgeries in 2000.  The data alone demonstrate <u>a doubling</u> of the surgeries

10   performed annually in the Central clinic over the 1994-2000 time frame.  At the same time, the

11   <u>number of patients</u> seen by Central Ophthalmology <u>actually declined sharply between 1996 and</u>

12   <u>1999</u>.  Importantly, these data do not include hundreds of additional surgeries being performed

13   during the same period in the separate Eastside Clinic.

14

15       54.    Michael Lee, M.D. is Chief of Ophthalmology for GHP.  After Dr. Lee became

16   Chief in January 2006, he instituted a variety of directives designed to increase RVUs by

17   increasing the number of inappropriate cataract surgeries.  When Dr. Lee first met with Dr.

18   Zemplenyi following his promotion, he demanded that she increase the number of RVUs she

19
     generated.  Given her patient population, Dr. Lee understood that this required performing more
20
     RVU-heavy cataract surgeries.   Dr. Lee also directed Dr. Zemplenyi and her colleagues to
21
22   minimize referrals to qualified external physicians so as to ensure greater RVU production for

23   GHP physicians.

24       55.    Dr. Lee convened a number of departmental meetings in 2006 and 2007.  At each

25   meeting, Dr. Lee ordered the ophthalmologists present to increase RVUs, requiring that they

26   perform more cataract surgeries.  Dr. Zemplenyi began to suspect that many surgeries were being

**SECOND AMENDED COMPLAINT** - 18

Lybeck◆Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

performed inappropriately in violation of Medicare criteria.  Dr. Lee's directives to perform more surgeries were made without regard to the interests of any particular patient and without regard for the medical necessity of surgery.

56.     Ophthalmology department data show the effect these directives and other revenue-spiking demands have had on the number of surgeries performed.   During the first quarter of 2006, ophthalmologists performed at least 487 cataract surgeries.   Annualized, this quarterly figure corresponds to 1,948 surgeries.

57.     More recent data demonstrate a continuing sharp rise in the number of surgeries despite a patient population that remains level.  In 2007, GHP ophthalmologists performed 2,987 (mostly cataract) surgeries.  During the first half of 2008, there were 1,744 surgeries.  Projected at an annual pace, this amounts to 3,488 surgeries, a 17% increase over the prior year.[1]

58.     While demanding that ophthalmologists perform ever-increasing numbers of surgeries, Defendants made additional efforts to shift otherwise appropriate services and procedures away from ophthalmologists and toward lesser qualified optometric physicians.  This was intended to keep ophthalmologists performing only the lucrative surgical procedures while reducing the total systemic costs of capitated care.   This effort also resulted in optometric physicians performing medical services they were not qualified or licensed to perform.  Terrence Clark, O.D., a GHP optometric physician, has been investigated and sanctioned by the Washington State Department of Health for performing unlicensed surgery or invasive procedures.

59.     Defendants continued their internal and external efforts to increase RVUs in

---

[1] These most recent data may include a small portion of non-cataract surgeries, though the estimated count of total surgeries has been reduced to exclude all procedures performed by certain GHP ophthalmologists known to specialize in non-cataract procedures.

**SECOND AMENDED COMPLAINT** - 19

Lybeck◆Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

connection with Eye Care Services.  At a 2007 ophthalmology department meeting, Medical Director Marc Mora, M.D. directed GHP ophthalmologists to increase RVUs by performing more surgeries.  Chief Medical Executive Michael Soman, M.D. also promoted the Eye Care Services department's increased RVUs.  In fall 2008 Defendants boasted of performing "3,000 cataract surgeries a year."

**C.    Defendants' False Statements, Records and Certifications Resulting in Improper Payments Received From CMS.**

60.    In furtherance of the scheme described in detail above, from at least 2004 through the present, Defendants have submitted hundreds if not thousands of bid materials, data reports, false certifications and other documents and records containing or reflecting medically unnecessary and inappropriately documented cataract surgeries.  As a result of submitting these false records and data, Group Health and its affiliates have received substantially enhanced and inflated capitated payments from CMS.  Dr. Zemplenyi is personally aware of at least 10 individual cases resulting in false claims from within just the past few years.

61.    In or about September 2004, in order to secure higher risk-adjusted capitation payments for individual beneficiaries under one or more MA plans, Defendants provided data reflecting diagnoses made in connection with unnecessary medical procedures and treatment, including medically inappropriate cataract surgeries performed during 2003 and 2004.  These false data were reflected in submissions that were made to CMS via the Palmetto Front-End Risk Adjustment System (FERAS), the CMS Risk Adjustment Processing System (RAPS) or substantially similar software.

62.    In or about March 2005, in order to secure higher risk-adjusted capitation payments for individual beneficiaries under one or more MA plans, Defendants provided data

Lybeck◊Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

reflecting diagnoses made in connection with unnecessary medical procedures and treatment, including medically inappropriate cataract surgeries performed during 2004. These false data were reflected in submissions that were made to CMS via FERAS, RAPS or substantially similar software.

63.      In or about 2005, in support of their bid(s) to provide Medicare-covered services for contract year 2006 in connection with one or more MA plans, Defendants provided experience data containing, reflecting or based upon the alleged "cost" of unnecessary medical procedures, including medically inappropriate cataract surgeries performed during 2004. These falsely inflated data were reflected in submissions that were made to CMS via the Bid Pricing Tool or substantially similar software.

64.      In or about September 2005, in order to secure higher risk-adjusted capitation payments for individual beneficiaries under one or more MA plans, Defendants provided data reflecting diagnoses made in connection with unnecessary medical procedures and treatment, including medically inappropriate cataract surgeries performed during 2004 and 2005. These false data were reflected in submissions that were made to CMS via FERAS, RAPS or substantially similar software.

65.      In or about March 2006, in order to secure higher risk-adjusted capitation payments for individual beneficiaries under one or more MA plans, Defendants provided data reflecting diagnoses made in connection with unnecessary medical procedures and treatment, including medically inappropriate cataract surgeries performed during 2006. These false data were reflected in submissions that were made to CMS via FERAS, RAPS or substantially similar software.

66.      In or about 2006, in support of their bid(s) to provide Medicare-covered services

SECOND AMENDED COMPLAINT - 21

1   for contract year 2007 in connection with one or more MA plans, Defendants provided experience

2   data containing, reflecting or based upon the alleged "cost" of unnecessary medical procedures,

3   including medically inappropriate cataract surgeries performed during 2005.   These falsely

4   inflated data were reflected in submissions that were made to CMS via the Bid Pricing Tool or

5   substantially similar software.

6

7         67.        In or about September 2006, in order to secure higher risk-adjusted capitation

8   payments for individual beneficiaries under one or more MA plans, Defendants provided data

9   reflecting diagnoses made in connection with unnecessary medical procedures and treatment,

10   including medically inappropriate cataract surgeries performed during 2005 and 2006.   These

11   false data were reflected in submissions that were made to CMS via FERAS, RAPS or

12   substantially similar software.

13

14         68.        In or about March 2007, in order to secure higher risk-adjusted capitation

15   payments for individual beneficiaries under one or more MA plans, Defendants provided data

16   reflecting diagnoses made in connection with unnecessary medical procedures and treatment,

17   including medically inappropriate cataract surgeries performed during 2006.   These false data

18   were reflected in submissions that were made to CMS via FERAS, RAPS or substantially similar

19   software.

20

21         69.        In or about 2007, in support of their bid(s) to provide Medicare-covered services

22   for contract year 2008 in connection with one or more MA plans, Defendants provided experience

23   data containing, reflecting or based upon the alleged "cost" of unnecessary medical procedures,

24   including medically inappropriate cataract surgeries performed during 2006.   These falsely

25   inflated data were reflected in submissions that were made to CMS via the Bid Pricing Tool or

26   substantially similar software.

**SECOND AMENDED COMPLAINT** - 22

70.     In or about September 2007, in order to secure higher risk-adjusted capitation payments for individual beneficiaries under one or more MA plans, Defendants provided data reflecting diagnoses made in connection with unnecessary medical procedures and treatment, including medically inappropriate cataract surgeries performed during 2006 and 2007.  These false data were reflected in submissions that were made to CMS via FERAS, RAPS or substantially similar software.

71.     In or about March 2008, in order to secure higher risk-adjusted capitation payments for individual beneficiaries under one or more MA plans, Defendants provided data reflecting diagnoses made in connection with unnecessary medical procedures and treatment, including medically inappropriate cataract surgeries performed during 2007.  These false data were reflected in submissions that were made to CMS via FERAS, RAPS or substantially similar software.

72.     In or about 2008, in support of their bid(s) to provide Medicare-covered services for contract year 2009 in connection with one or more MA plans, Defendants provided experience data containing, reflecting or based upon the alleged "cost" of unnecessary medical procedures, including medically inappropriate cataract surgeries performed during 2007.  These falsely inflated data were reflected in submissions that were made to CMS via the Bid Pricing Tool or substantially similar software.

73.     In or about September 2008, in order to secure higher risk-adjusted capitation payments for individual beneficiaries under one or more MA plans, Defendants provided data reflecting diagnoses made in connection with unnecessary medical procedures and treatment, including medically inappropriate cataract surgeries performed during 2007 and 2008.  These false data were reflected in submissions that were made to CMS via FERAS, RAPS or

Lybeck◆Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

1    substantially similar software.

2         74.    In or about March 2009, in order to secure higher risk-adjusted capitation

3    payments for individual beneficiaries under one or more MA plans, Defendants provided data

4    reflecting diagnoses made in connection with unnecessary medical procedures and treatment,

5    including medically inappropriate cataract surgeries performed during 2008.  These false data

6    were reflected in submissions that were made to CMS via FERAS, RAPS or substantially similar

7

8    software.

9         75.    In or about 2009, in support of their bid(s) to provide Medicare-covered services

10   for contract year 2010 in connection with one or more MA plans, Defendants provided experience

11   data containing, reflecting or based upon the alleged "cost" of unnecessary medical procedures,

12   including medically inappropriate cataract surgeries performed during 2008.  These falsely

13   inflated data were reflected in submissions that were made to CMS via the Bid Pricing Tool or

14   substantially similar software.

15

16        76.    In or about September 2009, in order to secure higher risk-adjusted capitation

17   payments for individual beneficiaries under one or more MA plans, Defendants provided data

18   reflecting diagnoses made in connection with unnecessary medical procedures and treatment,

19   including medically inappropriate cataract surgeries performed during 2008 and 2009.  These

20   false data were reflected in submissions that were made to CMS via FERAS, RAPS or

21   substantially similar software.

22

23        77.    In or about March 2010, in order to secure higher risk-adjusted capitation

24   payments for individual beneficiaries under one or more MA plans, Defendants provided data

25   reflecting diagnoses made in connection with unnecessary medical procedures and treatment,

26   including medically inappropriate cataract surgeries performed during 2009.  These false data

Lybeck◊Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

1    were reflected in submissions that were made to CMS via FERAS, RAPS or substantially similar

2    software.

3        78.      In or about September 2010, in order to secure higher risk-adjusted capitation

4    payments for individual beneficiaries under one or more MA plans, Defendants provided data

5    reflecting diagnoses made in connection with unnecessary medical procedures and treatment,

6    including medically inappropriate cataract surgeries performed during 2009 and 2010.   These

7    false data were reflected in submissions that were made to CMS via FERAS, RAPS or

8    substantially similar software.

9

10       79.      Upon information and belief, the bid materials and data submissions described

11   above were accompanied by false certifications by Defendants' executive employees or other

12   agents that the included data were accurate, complete, and truthful.   Even if Defendants did not

13   expressly certify that the data were accurate, complete, and truthful in each case, Defendants'

14   submissions of false data for purposes of determining or adjusting payments received from CMS

15   represent impliedly false certifications that the data were accurate, complete, and truthful; and that

16   the medical services the data reflected were rendered in compliance with 42 U.S.C. §

17   1395y(a)(1)(A), the FCA, and other federal laws and regulations designed to prevent or ameliorate

18   fraud, waste, and abuse. *See United States ex rel. Ebeid v. Lungwitz*, No. 1:09-16122, 2010 WL

19   3092637 (9th Cir. Aug. 9, 2010)

20       80.      As a result of the false bid materials, data submissions and certifications described

21   above, CMS made monthly payments to Defendants in amounts that were greater than, or

22   different from, those payments that Defendants would have received had the false bid materials,

23   data submissions and certifications not been provided; and CMS provided credits or made

24   adjustments to payments in a manner which ultimately benefitted the Defendants to the detriment

Lybeck◊Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

1    of the United States.

2        **D.**     **Dr. Zemplenyi's History of Recognized Excellence with Group Health.**

3        81.     For nearly twenty years, Dr. Zemplenyi was a dedicated employee of Group Health

4    and GHP.  Throughout her tenure, she was committed to professional excellence, appropriate care

5    for her patients, and the institutional integrity of Group Health.  During these years, Group Health

6

7    and its supervisory staff frequently recognized Dr. Zemplenyi's dedicated and excellent work.

8        82.     Dr. Zemplenyi graduated *magna cum laude* from Harvard University in 1979, and

9    received her Doctor of Medicine degree in 1983 from the School of Medicine at the University of

10   California, Los Angeles.  In 1984, she completed a Medical Internship at Veteran's

11   Administration Hospital in Sepulveda, California.  From 1985 through 1987, she was a Resident

12   in Ophthalmology with the Jules Stein Eye Institute at UCLA.

13

14       83.     Dr. Zemplenyi joined Group Health in June 1988.  She began working at the

15   Central Ophthalmology clinic in Seattle, and remained there until early 2006.

16       84.     Group Health routinely conducted Annual Performance Reviews of its providers,

17   including consultative specialists like Dr. Zemplenyi.  Dr. Zemplenyi had for years received

18   uniformly positive reviews.  In fact, in a November 1, 2005 Review, Dr. Zemplenyi was found to

19

20   be a "Excellent Performer" in all of the seven included areas of general performance, including

21   "Professional Competence & Clinical Excellence", "Fulfills Professional Practice Responsibilities

22   in GHP Integrated Practice", "Superior Patient Experience: Patient Relationships", and "Work

23   Ethic/Productivity".  In the same Review, then-Chief Chris Diehl, M.D. commented that "she

24   works well to support departmental needs & patient care."  No improvements were required based

25   on this 2005 Review.  In September 2006, David Caton, O.D., the Chief of Optometry in the

26   Federal Way clinic, expressed his approval for Dr. Zemplenyi's performance in that clinic.

Lybeck◇Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

85.     Dr. Zemplenyi had planned to continue her dedicated service to the Group Health patient base.  In fact, in late 2006, Dr. Zemplenyi advised the Defendants that she planned to continue working for Group Health for an additional ten years or more.

**E.     Dr. Zemplenyi's Reporting of Defendants' False Claims; Defendants' Harassment and Constructive Termination of Dr. Zemplenyi.**

86.     During her tenure with GHP, Dr. Zemplenyi gradually became aware of the remarkable increase over the years in the number of cataract surgeries being performed by the ophthalmology department.  Although she was chiefly focused on her own practice and the care of her patients, she began to suspect that some of her colleagues were performing cataract surgeries without adhering to appropriate guidelines and standards.

87.     In early 2005, Defendants advised the ophthalmology department that they *should not* perform an additional pre-operative examination of cataract patients if they had been seen within six months before surgery.  Instead Defendants instructed their ophthalmologists to proceed directly into surgery.  This instruction was in direct violation of the Medicare/Noridian guidelines requiring a pre-operative examination within three months before surgery.  Dr. Zemplenyi expressed her opinion that this longer six month period without pre-operative physician observation was too long, was a violation of Medicare requirements, and a potential danger to patients.

88.     Throughout 2005 and 2006, Dr. Zemplenyi continued to discuss and object to GHP physicians performing cataract surgeries outside Medicare compliance.  Despite her reports and objections, Defendants consistently advocated performing surgeries as frequently as possible, and ignored Dr. Zemplenyi's concern that cataract patients be closely observed before operating and that alternative forms of treatment be explored.

Lybeck◊Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255  Fax 206-230-7791

89.     Despite her protests, tenure and established policies to the contrary, in retaliation for her reports and objections, in April 2006, Dr. Zemplenyi was transferred to the Federal Way clinic.  Dr. Zemplenyi had worked in the Central clinic for 18 years and had seniority over all but one of her colleagues in the Eastside clinic.  During the summer of 2006, Dr. Zemplenyi repeatedly requested a meeting with her supervisors including Dr. Lee to discuss the reasons for her transfer to Federal Way.  No explanation for the transfer was offered.

90.     After her retaliatory transfer to Federal Way, Dr. Zemplenyi undertook an investigation of Defendants' non-compliance with the Medicare/Noridian criteria for cataract surgeries.  She reviewed files for patients who had recently undergone cataract surgeries and confirmed that Defendants had failed to meet the criteria in those cases.[2]  In compliance with

_____

[2] Out of due concern for patient confidentiality and privacy, Dr. Zemplenyi has not attached to her pleadings medical records or provided specific details regarding these individual cases.  However, records and information regarding six cases were previously provided to the Government pursuant to 31 U.S.C. §§ 3730(e)(4)(B) and 3730(b)(2).  For the court's reference, below are details regarding these cases:

After a most recent preoperative exam on 10/31/05, Patient "CS" underwent surgery of the left eye on 3/2/06, and surgery on the right eye on 5/25/06.  Both surgeries were performed without a prior standardized determination of visual function status; without Snellen visual acuity of 20/50 or worse; without glare testing; with an excessive interval between preoperative exam and surgery; and with insufficient time to assess the need for a second surgery.

After a most recent preoperative exam on 2/15/06, Patient "MI" underwent surgery of the left eye on 5/25/06.  Surgery was performed without a prior standardized determination of visual function status; without Snellen visual acuity of 20/50 or worse; without glare testing; and with an excessive interval between preoperative exam and surgery.

After a most recent preoperative exam on 2/8/06, Patient "BW" underwent surgery of the right eye on 5/22/06.  Surgery was performed without a prior standardized determination of visual function status; without Snellen visual acuity of 20/50 or worse; without glare testing; without refraction; and with an excessive interval between preoperative exam and surgery.

After a most recent preoperative exam on 3/10/05, Patient" NB" underwent surgery of the left eye on 4/26/05.  Surgery was performed without a prior standardized determination of visual function status; without Snell visual acuity of 20/50 or worse; and without glare testing.

After a most recent preoperative exam on 2/6/06, Patient "ML" underwent surgery of the right eye on 5/19/06.  Surgery was performed without a prior standardized determination of visual function status; without Snell visual acuity of 20/50 or worse; without glare testing; and with an excessive interval between preoperative exam and surgery.

After a most recent preoperative exam on 12/2/05, Patient "DJ" underwent surgery of the left eye on 4/25/06, and surgery on the right eye on 5/19/06.  Both surgeries were performed without a prior standardized determination of visual function status; without Snellen visual acuity of 20/50 or worse; without glare testing; with an excessive interval between preoperative exam and surgery; and with insufficient time to assess the need for a

**SECOND AMENDED COMPLAINT** - 28

Defendants' stated policies, Dr. Zemplenyi contacted Group Health's Medicare Compliance Officer, Kathy Harris, about her concerns.  Ms. Harris requested that Dr. Zemplenyi provide some of the patient files documenting the unnecessary services for Ms. Harris to review.  Dr. Zemplenyi did so in August 2006.  Ms. Harris later independently determined that in each case she reviewed Defendants had violated the Medicare/Noridian surgical and billing criteria.  In another exemplary case, cataract surgery had been recklessly performed on a patient despite the patient's pre-existing blindness in that surgical eye.  The surgery had no possibility of restoring vision to the patient, created great health risk, and should not have been done.   Defendants submitted bid documents and data  containing, reflecting or based upon the alleged "cost" of medically unnecessary services rendered in these specific cases.

91.     In September 2006, more than four months after her forced transfer to Federal Way, Dr. Lee finally agreed to meet with Dr. Zemplenyi.  Dr. Zemplenyi explained that there was a smaller patient population at the Federal Way clinic (and therefore a lesser number of appropriate candidates for surgery).   Because of the low surgical need, she requested the opportunity to work at the Central clinic one or two days per week.  Defendants declined her proposal and continued to demand instead that she increase her RVUs by doing more surgeries on patients at Federal Way.

92.     During the September 2006 meeting, Dr. Zemplenyi also raised with Dr. Lee her concerns that GHP physicians were performing unnecessary cataract and other surgeries in violation of the Medicare/Noridian reimbursement criteria.  She explained that she herself had been pressured to perform surgeries that were not indicated and which violated billing criteria.

93.     Following the meeting, Dr. Lee asked an assistant to collect Medicare/Noridian

second surgery.

**SECOND AMENDED COMPLAINT** - 29

Lybeck◊Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

1   billing criteria.  At least one GHP ophthalmologist acknowledged that the Medicare criteria were

2   not being met.

3        94.    Following the September 2006 meeting with Dr. Zemplenyi in which she

4   confronted Dr. Lee with Defendants' violations of Medicare/Noridian criteria, Defendants

5   orchestrated a scheme to wrongfully discharge Dr. Zemplenyi from her employment with GHP.

6

7        95.    Despite her exemplary 20-year performance, Dr. Lee abruptly determined that Dr.

8   Zemplenyi should be subject to a "Performance Development Plan" (PDP).  Under Defendants'

9   employment policies, a PDP is typically employed as the last formal step taken before an

10  employee is subject to termination.   Given the fact that Dr. Zemplenyi had had no prior

11  discussions with Defendants regarding the need for improving her performance, a PDP in these

12  circumstances was an extreme event not sanctioned by GHP's employment and personnel

13  practices.

14

15       96.    It was not until October 2006, during her regular Annual Performance Review,

16  that Dr. Zemplenyi was informed that she would be receiving a PDP.  The only items mentioned

17  as deficiencies in her performance during the October 2006 Annual Performance Review were the

18  number of patients she saw and the number of cataract surgeries she performed.  Dr. Zemplenyi

19  again explained that the relatively small patient population at the Federal Way clinic did not

20  support an increase in necessary and appropriate cataract surgeries.  Dr. Lee warned that a PDP

21  would be issued, but advised Dr. Zemplenyi that she would have an opportunity to respond to it.

22

23       97.    After the October 2006 Annual Performance Review, the Group Health Medicare

24  compliance officer, Ms. Harris, disclosed to Dr. Zemplenyi that Dr. Lee had inappropriately

25  confronted her demanding that she identify Dr. Zemplenyi as the person who had complained

26  about Defendants' false cataract surgery claims.  Ms. Harris repeatedly refused to respond to Dr.

1    Lee's demands.

2         98.    Concerned by Dr. Lee's inappropriate contact and demand for confidential

3    information, Ms. Harris contacted her supervisor and reported Dr. Lee's anticipated intent to

4    further retaliate against Dr. Zemplenyi.

5         99.    A biennial Medicare compliance audit had been scheduled for fall 2006.

6    Following Dr. Zemplenyi's reports, the audit was abruptly postponed.  It is unknown whether the

7

8    audit has yet occurred.

9         100.   Months passed since Defendants threatened Dr. Zemplenyi with the PDP.

10   Between October 2006 and July 2007, Dr. Zemplenyi repeatedly inquired about the status of the

11   PDP with no response.  In fact, Defendants had no communications with Dr. Zemplenyi about her

12   performance and offered no input about how it should improve.

13

14        101.   During this nine-month period, Dr. Zemplenyi was subjected to extensive

15   concerted efforts to effectuate her discharge.  Defendants gathered any available information that

16   could be used as a pretext to justify adverse employment actions against her.  Dr. Lee and other

17   GHP employees acted in concert to devise baseless criticisms of Dr. Zemplenyi's performance.

18        102.   Defendants went so far as to revise long standing Workload Guidelines in an effort

19   to silence Dr. Zemplenyi and cause her termination.  New Guidelines were adopted allowing any

20   employee (even with nearly 20 years' tenure) subject to a PDP to be summarily terminated with

21   no right to appeal or be heard during a "reduction in force" operation.

22

23        103.   Dr. Zemplenyi became increasingly aware of Defendants' efforts to silence and

24   discharge her.  She was unfairly singled out and every facet of her professional practice was

25   examined, whether or not it was germane to the clinical or surgical abilities normally the subject

26   of an Annual Performance Review.  Dr. Zemplenyi was subjected to considerable emotional and

**SECOND AMENDED COMPLAINT** - 31

Lybeck◊Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

1   mental distress, anxiety, and fear for her professional standing, reputation and financial security.

2       104.    In July 2007, over nine months after the threatened PDP during her 2006 Annual

3   Performance Review, Defendants first formally presented the PDP to Dr. Zemplenyi.  The PDP

4   raised issues that had never previously been mentioned or addressed.  Defendants never allowed

5   Dr. Zemplenyi an opportunity to respond to the PDP.  Contrary to policy, it simply became a

6   permanent part of her employment file.

7

8       105.    Ms. Harris in Medicare Compliance retired. The new Group Health compliance

9   officer who replaced her was aware of Dr. Lee's retaliation, and suggested to Dr. Zemplenyi that

10  she contact the Human Resources Department.   After Dr. Zemplenyi reported Defendants'

11  harassment and retaliation, Defendants hired an "independent" investigator to look into Dr.

12  Zemplenyi's complaint.   The investigator was in fact not "independent" but was a former

13  employee of Group Health who maintained close personal and business relationships with

14  Defendants' executive and managerial employees.  During her "investigation," the investigator

15  worked closely with Defendants, while declining to pursue leads and interview witnesses

16  suggested by Dr. Zemplenyi.  The investigator submitted a report to Defendants in October 2007.

17  The report was no shared with Dr. Zemplenyi. The report contained numerous self-serving and

18  even self-contradictory findings.  Contrary to the Group Health Medicare compliance officers'

19  earlier determinations, this investigator concluded that Dr. Zemplenyi's reports of surgical and

20  billing irregularities were not substantiated.

21

22

23      106.    Even though the PDP was issued with the pretext of allowing Dr. Zemplenyi's

24  performance to improve, in reality Defendants had determined that Dr. Zemplenyi would be

25  silenced and terminated.  Dr. Lee secretly confirmed this in an email to another GHP doctor

26  seeking his help in devising an "exit plan" for Dr. Zemplenyi.

**SECOND AMENDED COMPLAINT** - 32

Lybeck❖Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

107.    With no opportunity to see the report or respond to the PDP, Dr. Zemplenyi was denied her right to internal appeal and review of Defendants' adverse actions against her. She was subjected to continuing and relentless scrutiny and all manner of gossip and innuendo by her colleagues and supervisors. Because of the pervasive harassment and persecution, Dr. Zemplenyi suffered serious emotional and mental distress. In this environment she could no longer appropriately care for GHP patients and she was constructively discharged in November 2007 after nearly 20 years of service.

## FIRST CAUSE OF ACTION

### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(1)
### Against all Defendants

108.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1-107 above.

109.    Defendants knowingly presented or caused to be presented to an officer, employee or agent of the United States false or fraudulent claims for payment by the Medicare program, in violation of 31 U.S.C. § 3729(a)(1).

110.    The United States paid such false or fraudulent claims because of the acts of Defendants.

111.    By reason of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(1), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment. In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## SECOND CAUSE OF ACTION

### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(2)
### Against all Defendants

112.    Plaintiffs re-allege and incorporate herein by reference paragraphs 1-111 above.

Lybeck❖Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

113.     As set forth above, in connection with the foregoing scheme, Defendants knowingly made, used or caused to be made or used, false records and statements to get false or fraudulent claims paid or approved by the United States, in violation of 31 U.S.C. § 3729(a)(2).

114.     The United States paid such false or fraudulent claims because of the acts of Defendants.

115.     By reason of the acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(2), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment.  In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

## THIRD CAUSE OF ACTION

### Violations of the False Claims Act, 31 U.S.C. § 3729(a)(3)
### Against all Defendants

116.     Plaintiffs re-allege and incorporate herein by reference paragraphs 1-115 above.

117.     As set forth above, in connection with the foregoing scheme, Defendants conspired to get false or fraudulent claims paid or approved by the United States, in violation of 31 U.S.C. § 3729(a)(3).

118.     The United States paid such false or fraudulent claims because of the conspiratorial acts of Defendants.

119.     By reason of the conspiratorial acts and conduct of Defendants in violation of 31 U.S.C. § 3729(a)(3), the United States has suffered actual damages, including the total amounts paid in response to all such false or fraudulent claims for payment.  In addition, the United States is entitled to recover civil money penalties, and other monetary relief as deemed appropriate.

Lybeck✦Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

## FOURTH CAUSE OF ACTION

### Violations of the False Claims Act, 31 U.S.C. § 3730(h)
### Against all Defendants

120.  Plaintiffs re-allege and incorporate herein by reference paragraphs 1-119 above.

121.  As set forth above, in connection with the foregoing scheme, Defendants conspired to get false or fraudulent claims paid or approved by the United States, in violation of the False Claims Act.

122.  As set forth above, Eva Zemplenyi, M.D. was threatened, harassed, discriminated against and ultimately discharged by Defendants as a result of her performing lawful acts in furtherance of this action, including her investigating and refusing to participate in Defendants' wrongful acts and conduct in violation of the False Claims Act.  At all relevant times, Eva Zemplenyi, M.D. was engaging in activity that was protected by the False Claims Act. Defendants, knowing that Eva Zemplenyi, M.D. was engaging in such activity, discriminated against her because of it.

123.  Defendants can offer no justification for their threatening, harassing, discriminating against, and discharging Eva Zemplenyi, M.D.

124.  In order to redress the harms she has suffered as a result of the acts and conduct of Defendants in violation of 31 U.S.C. § 3730(h), Eva Zemplenyi, M.D. is entitled to damages including two times the amount of back pay, interest on back pay, and compensation for any special damage, including emotional distress, and any other damages available by law including litigation costs and reasonable attorneys' fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand and pray that judgment be entered in their favor and

Lybeck◆Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

against Defendants jointly and severally as follows:

1.      For money damages in the amount of the United States' damages, payments, other losses, and civil penalties, as are allowable under the False Claims Act, for each false or fraudulent claim, including an award to Dr. Zemplenyi as the *qui tam* Plaintiff under 21 U.S.C. § 3730, and all costs of this civil action;

2.      For money damages to redress the harms personally suffered by Eva Zemplenyi, M.D., including two times the amount of back pay, interest on back pay, front pay, and compensation for all special damages available by law, including emotional distress, litigation costs, and reasonable attorneys' fees;

3.      For interest, costs, reasonable attorneys' fees, and other expenses; and

4.      For all such further relief as the Court may deem just and proper.

### Jury Demand

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury.

Respectfully submitted this _13th_ day of October, 2010.

LYBECK MURPHY, LLP


By: ____/s/ *Benjamin R. Justus*_____
        Lory R. Lybeck (WSBA #18125)
        Benjamin R. Justus (WSBA #38855)
Attorneys for Plaintiffs

Lybeck◆Murphy LLP
7525 SE 24th Street, Ste. 500
Mercer Island, WA  98040-2334
206-230-4255   Fax 206-230-7791

1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**

2

3

**CERTIFICATE OF SERVICE**

4        I hereby certify that on the 13th day of October, 2010, I caused to be filed the foregoing
Second Amended Complaint with the Clerk of Court using the CM/ECF system, which will
5   send notification of such filing to the following parties:

6        Counsel for Defendants:

7            David B. Robbins: drobbins@bbllaw.com, ECF@bbllaw.com
             Renee M. Howard: rhoward@bbllaw.com
8

9        Counsel for Plaintiff United States of America:

10           Peter Angus Winn: Peter.Winn@usdoj.gov

11

12   All parties are registered as CM/ECF participants for electronic notification.

13       DATED at Mercer Island, Washington, this 13th day of October, 2010.

14                                   By: __ */s/ Benjamin R. Justus*_____
                                     Lory R. Lybeck (WSBA #18125)
15                                   Benjamin R. Justus (WSBA #38855)
                                     Attorneys for plaintiffs
16                                   Lybeck Murphy, LLP
                                     7525 SE 24th Street, Ste. 500
17                                   Mercer Island, WA 98040
                                     (206) 230-4255 /phone
18                                   (206) 230-7791 /fax
                                     brj@lybeckmurphy.com
19

20

21

22

23

24

25

26