UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. EVA ZEMPLENYI, M.D., and EVA ZEMPLENYI, M.D., individually,<br><br>Plaintiff,<br><br>v.<br><br>GROUP HEALTH COOPERATIVE, GROUP HEALTH PERMANENTE, GROUP HEALTH OPTIONS, INC., KPS HEALTH PLANS, GROUP HEALTH NORTHWEST,<br><br>Defendants. | CASE NO. C09-603-RSM<br><br>ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

This matter comes before the Court upon Defendants' motion for summary judgment. Dkt. # 37. For the following reasons, the motion for summary judgment is GRANTED.

## II. BACKGROUND

A.  Facts

Defendant Group Health Cooperative is a non-profit health system that both delivers and covers health care.  Second Amended Complaint ("SAC") ¶ 14.  Defendant Group Health Permanente is a physician-owned corporation that contracts exclusively with Group Health Cooperative to provide medical care in Group Health Cooperative-owned and -operated facilities.  *Id.* ¶ 15.  Defendants are collectively referred to as "Group Health."

Plaintiff Eva Zemplenyi, M.D., is an ophthalmologist who worked for Group Health from June 1988 to November 2007.  SAC ¶¶ 83, 107.  According to Zemplenyi, Group Health officers ordered Group Health ophthalmologists to perform unnecessary cataract surgeries on Medicare beneficiaries in order to claim greater reimbursement from Medicare.  *Id.* ¶¶ 54-55, 59.  The alleged fraudulent scheme is somewhat indirect.  Group Health is reimbursed by Medicare on a "capitated" basis.  *Id.* ¶ 4.  In a capitated system, the Medicare provider packages all patient services for beneficiaries in exchange for a per patient payment.  *Id.* ¶ 23.  Generally, the provider sets the per patient payment by submitting to Medicare a bid explaining the costs it anticipates for providing services to beneficiaries during the coming year.  *Id.* ¶ 25.  This bid is based in part on the costs of past services.  *Id.* ¶ 26.  Within this framework, surgical procedures are of relatively high value.  *Id.* ¶ 49.

Zemplenyi alleges that Group Health sought and received higher capitation payments from Medicare by pressuring doctors to conduct medically unnecessary cataract surgeries and submitting bid materials based in part on those surgeries.  *Id.* ¶¶ 60-78.  Zemplenyi alleges that she objected to the pressure to conduct more cataract surgeries on the ground that the surgeries

did not comply with Medicare guidelines.  *Id.* ¶¶ 86-88, 92, 94.  As a result, she was subject to various forms of retaliation.  *Id.* ¶¶ 89, 94-96, 101-07, 122.

**B.  Litigation**

Zemplenyi sued Group Health and several Group Health subsidiaries under the False Claims Act ("FCA").  She raised *qui tam* claims on behalf of the United States pursuant to 31 U.S.C. § 3729(a)(1), (2), and (3) to recover fraudulent Medicare reimbursement claims.  SAC ¶¶ 108-19.  She also raised a claim for retaliation pursuant to 31 U.S.C. § 3730(h).  SAC ¶¶ 120-24.  Group Health moved to dismiss the SAC under Federal Rule of Civil Procedure 12(b)(6).  Dkt. # 21.  The Court granted the motion as to the *qui tam* claims but denied it as to the retaliation claim.  Dkt. # 25.  Zemplenyi later voluntarily dismissed the Group Health subsidiaries.  Dkt. # 32.

## III. DISCUSSION

**A.  Summary judgment standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which might affect the outcome of the suit under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court does not weigh evidence to determine the truth of the matter but instead "only determine[s] whether there is a genuine issue for trial."  *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994).

The Court draws all reasonable inferences in favor of the non-moving party.  *Mattos v. Agarano*, 661 F.3d 433, 439 (9th Cir. 2011) (en banc).  Nonetheless, the non-moving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

did not comply with Medicare guidelines.  *Id.* ¶¶ 86-88, 92, 94.  As a result, she was subject to various forms of retaliation.  *Id.* ¶¶ 89, 94-96, 101-07, 122.

**B.  Litigation**

Zemplenyi sued Group Health and several Group Health subsidiaries under the False Claims Act ("FCA").  She raised *qui tam* claims on behalf of the United States pursuant to 31 U.S.C. § 3729(a)(1), (2), and (3) to recover fraudulent Medicare reimbursement claims.  SAC ¶¶ 108-19.  She also raised a claim for retaliation pursuant to 31 U.S.C. § 3730(h).  SAC ¶¶ 120-24.  Group Health moved to dismiss the SAC under Federal Rule of Civil Procedure 12(b)(6).  Dkt. # 21.  The Court granted the motion as to the *qui tam* claims but denied it as to the retaliation claim.  Dkt. # 25.  Zemplenyi later voluntarily dismissed the Group Health subsidiaries.  Dkt. # 32.

## III. DISCUSSION

**A.  Summary judgment standard**

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Material facts are those which might affect the outcome of the suit under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The Court does not weigh evidence to determine the truth of the matter but instead "only determine[s] whether there is a genuine issue for trial."  *Crane v. Conoco, Inc.*, 41 F.3d 547, 549 (9th Cir. 1994).

The Court draws all reasonable inferences in favor of the non-moving party.  *Mattos v. Agarano*, 661 F.3d 433, 439 (9th Cir. 2011) (en banc).  Nonetheless, the non-moving party must make a "sufficient showing on an essential element of her case with respect to which she has the burden of proof" to survive summary judgment.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson,* 477 U.S. at 252.

**B.  Retaliation under the FCA**

The FCA authorizes a cause of action for an employee who "is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee" in furtherance of FCA claims or efforts to stop FCA violations.  31 U.S.C. § 3730(h).  "A plaintiff alleging a FCA retaliation claim must show three elements: (1) that he or she engaged in activity protected under the statute; (2) that the employer knew the plaintiff engaged in protected activity; and (3) that the employer discriminated against the plaintiff because he or she engaged in protected activity." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1103 (9th Cir. 2008).

There is no binding precedent on the burden of persuasion in FCA retaliation cases.  The parties assume that the familiar *McDonnell-Douglas* burden-shifting framework applies. *See* Dkt. # 37 at 5; Dkt. # 38 at 3.  The Court agrees. *See Harrington v. Aggregate Indus. Ne. Region, Inc.*, 668 F.3d 25, 30 (1st Cir. 2012).  Under this framework, Zemplenyi has the initial burden of establishing a *prima facie* case of retaliation. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220 (9th Cir. 1998).  If she establishes a *prima facie* case, the burden shifts to Group Health to articulate a legitimate, non-discriminatory reason for the alleged retaliatory acts. *Id.*  If Group Health does so, the burden shifts back to Zemplenyi to show a triable issue as to whether Defendants' explanation was pretextual. *Id.*

Zemplenyi's claim fails at the first *McDonnell-Douglas* stage: establishing a *prima facie* case of retaliation.  The Court finds that there is no triable issue as to whether Zemplenyi engaged in protected activity or suffered retaliatory discrimination.

1. Protected activity

Zemplenyi engaged in protected activity if she reasonably believed that Group Health committed fraud against the government and investigated the possible fraud. *Mendiondo*, 521 F.3d at 1103. The "belief" requirement contains both a subjective and objective element. "[A]n employee engages in protected activity where (1) the employee in good faith believes, and (2) a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government." *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 845 (9th Cir. 2002).

A jury could not reasonably find that Zemplenyi subjectively suspected fraud. The only specific instances in the record where Zemplenyi expressed concern about Medicare guidelines for cataract surgeries do not focus on fraud by Group Health. In an August 2006 email to Group Health's director of Medicare Programs and Compliance, Zemplenyi forwarded patient records that she "was not sure [met] Medicare criteria." Dkt. # 39, Ex. R. Her concern, Zemplenyi wrote, was that she might be prosecuted for failing to follow Medicare guidelines. *Id.* The minutes of a September 2006 meeting between Zemplenyi; Dr. Michael Lee, the head of Group Health's ophthalmology service line; and other Group Health employees refer in one sentence to concerns about other doctors complying with Medicare guidelines. *Id.* Ex. A. This discussion centered on Zemplenyi's worry that other doctors had ignored the criteria, not that Group Health was pushing them to disregard the criteria. *Id.*

Zemplenyi tries to show that she suspected fraud based on internal Group Health emails concerning Medicare guidelines and an upcoming Medicare audit. This argument is unpersuasive. The emails in question postdated the instances in which Zemplenyi expressed concern about Medicare guidelines. *See* Dkt. # 38 at 23; Dkt. # 39, Ex. C.; *Id.* Ex. DD. They

1  thus do not shed light on Zemplenyi's earlier subjective belief.  *Cf. Moore*, 275 F.3d at 846

2  (internal memorandum provided context relevant to FCA plaintiff's later subjective belief).

3        A jury also could not find that a reasonable employee would suspect fraud.  Under the

4  capitated payment system, any connection between increased utilization of a particular surgical

5  procedure and increased compensation from Medicare would be tenuous.  Cataract surgeries

6  make up only a portion of Group Health's services, and therefore an increase in cataract

7  surgeries would affect only a small portion of the costs projected in Group Health's bids to

8  Medicare.  A reasonable employee could not suspect that cataract surgeries had led to fraudulent

9  claims on Medicare without, at a minimum, evidence of the relative importance of cataract

10  surgery data in Group Health's bids.  *See* Dkt. # 39, Ex. EE 3; Dkt. # 43, Ex. I 49-51.  But

11  Zemplenyi did not even bother to learn the basic mechanics of Group Health's capitated payment

12  system, much less try to obtain the data underlying its bids.  Dkt. # 43 Ex. J 10.  Without a basic

13  idea of what evidence would be necessary to support a suspicion of fraud, any such suspicion

14  would have been speculative.  Zemplenyi must show "some nexus" between the concerns she

15  raised and a possible FCA violation, and she has failed to do so.  *See United States ex rel.*

16  *Hopper v. Anton*, 91 F.3d 1261, 1269 (9th Cir. 1996).

17        The Court need not address Zemplenyi's argument that Group Health withheld

18  information tending to show fraud during discovery and that the Court should therefore grant

19  leave for further discovery.  Dkt. # 38 at 24 n.81.  The key point is that Zemplenyi did not even

20  try to understand what information would be relevant to submitting a fraudulent bid during the

21  events in question.  It is Zemplenyi's earlier failure to investigate the capitated payment

22  system—not the current lack of evidence about Group Health's bids—that prevents Zemplenyi

23  from showing an objectively reasonable suspicion of fraud.

24

2. <u>Retaliatory discrimination</u>

Even if Zemplenyi could show a triable issue on whether she engaged in protected activity, there is no triable issue on whether she suffered retaliatory discrimination. Zemplenyi's allegations of retaliatory discrimination fall into two categories: (1) constructive termination and (2) "various forms of harassment, discrimination, threats and other adverse actions." SAC ¶ 107; Dkt. # 37, Howard Decl. Ex. C 6. The Court addresses each category in turn.

   *a. Constructive discharge*

In a FCA retaliation case, an employee can show constructive discharge by demonstrating that a reasonable person in her position "would . . . have felt . . . forced to quit because of intolerable and discriminatory working conditions." *Moore*, 275 F.3d at 847 (quoting *Huskey v. City of San Jose*, 204 F.3d 893, 900 (9th Cir. 2000)). "[C]onstructive discharge occurs when the working conditions deteriorate, as a result of discrimination, to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer," *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (2000) (internal quotation marks omitted) (explaining constructive discharge theory in Title VII context), or where coercion causes a "a reasonable person in [the employee's] position [to] feel [s]he ha[s] no choice but to retire," *Kalvinskas v. Cal. Inst. of Tech.*, 96 F.3d 1305, 1308 (9th Cir. 1996) (Age Discrimination in Employment Act context).

Group Health argues that Zemplenyi's only evidence of constructive discharge is that Lee put her on a Performance Development Plan ("PDP") four months before her November 2007 resignation. Dkt. # 37 at 9; SAC ¶ 95. Group Health points out that its policies classify PDPs as corrective rather than disciplinary. Dkt. # 37, Wohlheuter Decl. Ex. A 8. These policies describe PDPs as "provid[ing] an opportunity and resources to improve [performance], when a

1  chief has reason to believe that a medical group member can and will improve." *Id.* at 2. In
2  Zemplenyi's own PDP, Lee described her as "a valued and experienced physician" and
3  expressed "appreciation for [her] service to Group Health and its patients." Dkt. # 37,
4  Wohlheuter Decl. Ex. C 1. It offered resources to help Zemplenyi meet the PDP's goals and
5  acknowledged that she had already shown improvement. *Id.* at 4.
6        Zemplenyi does not dispute that the PDP is the basis of her constructive discharge claim.
7  *See* Dkt. # 38 at 5-10. She argues, however, that the PDP was designed to force her to resign.
8  She points to an email in which Lee discussed developing an exit plan in case she failed to meet
9  the PDP's goals. *Id.* at 7. But this email does not illuminate the PDP's effect on Zemplenyi
10  because she did not know of it until after she quit. *See* Dkt. # 43 Ex. B. Moreover, the content
11  of the email was consistent with the PDP being corrective rather than disciplinary. Lee
12  expressed hope in the email that the PDP would lead Zemplenyi to improve. *Id.*
13        Zemplenyi also cites testimony from Lee and a former Group Health employee that an
14  employee would likely find a PDP unpleasant. Dkt. # 38 at 7; Dkt. # 39 Ex. C 47; Dkt. # 40 at 2.
15  But performance critiques and suggestions for improvement are part of the ordinary tribulations
16  of the workplace. Even if "an undeserved negative performance review can constitute an
17  adverse employment decision," *Brooks*, 229 F.3d at 928, expectations of and support for
18  improvement are not "sufficiently extraordinary and egregious" to equal constructive discharge,
19  *see id.* at 930.
20        Last, Zemplenyi argues that the PDP's effect was "magnified by a contemporaneous
21  major change in policy." Dkt. # 38 at 8. She alleges that within weeks of her learning that she
22  would be subject to a PDP, Group Health announced a new policy that would allow layoffs of
23  tenured employees on PDPs. *Id.*; Dkt. # 39 Ex. F. This misstates the evidence. According to
24

Lee's uncontradicted testimony, the reduction in force provision was already part of Group Health's employment policy. The complained-of "change" was in fact a restatement of existing policy for guidelines written specifically for eye care staff. Dkt. # 37, Howard Decl. Ex. G. 52-53. Moreover, Zemplenyi testified that no one ever suggested to her that a reduction of force among ophthalmology staff was likely or that she had been placed on a PDP to make it easier to fire her. Dkt. # 37, Howard Decl. Ex. B. 262-63.

   *b. Adverse employment actions*

"[B]ehavior does not constitute retaliation under the FCA . . . unless it would be sufficient to constitute an adverse employment action under Title VII." *Moore*, 275 F.3d at 847-48. Under this standard, an act is retaliatory "if it is reasonably likely to deter employees from engaging in activity protected under [the FCA]."[1] *Id.* at 848. According to Zemplenyi's testimony, Lee alone was responsible for the retaliatory adverse employment actions. Dkt. # 43 Ex. H 88.

   1. Optometrist referrals

Zemplenyi contends that Lee condoned an optometrist's refusal to refer patients to her. Dkt. # 38 at 11. It is unclear whether this type of conduct can ever amount to retaliation. Although the Ninth Circuit has held that toleration of co-worker harassment can amount to retaliation, it appears to have done so only where the co-worker harassment was itself retaliation

---

[1] The standard articulated by the Ninth Circuit differs in phrasing but not substance from that of the Supreme Court. In *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), the Supreme Court held that an action is retaliatory under Title VII if it "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.* at 57. The Court sees no meaningful difference between the *Burlington Northern* standard and the Ninth Circuit's "reasonably likely to deter" language. *See Moore*, 275 F.3d at 848. Indeed, since *Burlington Northern* was decided the Ninth Circuit has continued to use the "reasonably likely to deter" language. *See, e.g.*, *Roth v. Cnty. of Maricopa*, 2011 WL 6170805, at *1 (9th Cir. Dec. 13, 2011). The Court will therefore rely on Ninth Circuit precedent defining what constitutes a retaliatory act.

for protected activity. *See, e.g.*, *Fielder v. UAL Corp.*, 218 F.3d 973, 984 (9th Cir. 2000), *cert. granted and opinion vacated on other grounds by* 536 U.S. 919 (2002). Zemplenyi has implicitly conceded that the optometrist's refusal to refer patients to her was not retaliation for protected activity, and she cites no authority for the proposition that the FCA required Lee to put a halt to a co-worker's non-retaliatory acts. *See* Dkt. # 43 Ex. H 88.

In any event, Lee's involvement in this conduct was not likely to deter protected activity. Lee gave uncontradicted testimony that he could not force any doctor to refer patients to another doctor. Dkt. # 39 Ex. C 148-49. Zemplenyi responds that a "contemporaneous email [shows] Lee expressed no hesitation or inability to direct the distribution of optometrist referrals." Dkt. # 38 at 11. This mischaracterizes the email in question, which merely discusses how one doctor was overworked as a result of Zemplenyi's light schedule and should not receive more referrals. Dkt. # 39 Ex. J. Lee undoubtedly could encourage more referrals to Zemplenyi and in fact did so. *Id.*; Dkt. # 43 Ex. D. But nothing suggests that Lee could require the optometrist in question to refer patients to Zemplenyi. Indeed, if Lee had had that power, he would have used it. Lee implemented the PDP in part because he thought Zemplenyi was treating too few patients. Dkt. # 37, Wohlheuter Decl. Ex. C 2, Ex. F 1, Ex. V 2.

2. Attendance policy enforcement

Zemplenyi argues that she was subject to an adverse employment action in the form of arbitrary enforcement of an attendance policy for quarterly ophthalmology staff meetings. Dkt. # 38 at 12. But although there is some evidence that other doctors occasionally missed meetings without any reprimands, it is undisputed that Zemplenyi regularly missed meetings. *See id.*; Dkt. # 37, Wohlheuter Decl. Ex. C 2; Dkt. # 43 Ex. F 22. Further, Lee approached the issue in a supportive manner. He told Zemplenyi that he recognized some conflicts were due to a pre-

planned vacation and school board duties and offered to reschedule the meetings to reduce the chance of conflicts. Dkt. # 37, Wohlheuter Decl. Ex. J 1.

### 3. External referral policy

Zemplenyi argues that she suffered from arbitrary enforcement of a policy requiring that another doctor approve her external referrals. Dkt. # 38 at 12. There is simply no evidence of arbitrary enforcement. The testimony Zemplenyi cites refers to a policy for all ophthalmologists at Zemplenyi's clinic, not just Zemplenyi. Dkt. # 39 Ex. J 52-53.

### 4. Audit of coding practices

Zemplenyi argues that she was subjected to a biased audit of her coding practices and that Lee scoured her patients' records for errors before telling an auditor which records to review. Dkt. # 38 at 13. The suggestion that Lee set her up to fail twists the evidence. Lee had previously identified coding as a problem in Zemplenyi's PDP, and Zemplenyi herself conceded this fault. Dkt. # 37, Howard Decl. Ex. B 192-93. Shortly before a meeting to discuss Zemplenyi's progress on the PDP's goals, Lee reviewed a set of Zemplenyi's records and found coding errors. Dkt. # 39 Ex. M. He then asked an auditor to review the previous week's records, which presumably offered a random selection of codes and the most current evidence of progress. *Id.* In short, the audit was merely a reasonable attempt to measure progress on an admitted performance issue.

### 5. Internal investigation of retaliation

Zemplenyi argues that an internal investigation of her claim of retaliation was biased. Dkt. # 38 at 13-14. She does not explain, however, why this bias would have deterred future protected activity.

### 6. Discipline for HIPAA violation

1	During a summer 2007 investigation into Zemplenyi's use of patient records, it came to
2	light that Zemplenyi had accessed family members' records. Dkt. # 39, Ex. U. A Group Health
3	Human Resources employee classified this act as a violation of the Health Insurance Portability
4	and Accountability Act ("HIPAA"). *Id.* Zemplenyi alleges that this accusation was false and
5	that she was subject to unwarranted disciplinary action. This theory fails. There is no evidence
6	that Lee ordered the incident to be classified as a HIPAA violation, and even if he had, his
7	involvement did not affect Zemplenyi. By Zemplenyi's own admission, she was upset solely
8	because the Human Resources employee did not respond to her explanations for why she had
9	accessed the records. Dkt. # 37, Howard Decl. Ex. B 230. In addition, the only consequence for
10	Zemplenyi was a two-hour HIPAA refresher course. Overall, the incident was not, as Zemplenyi
11	now argues, "an unwarranted disciplinary action," "a reprimand containing a false accusation,"
12	or "an unwarranted disciplinary investigation." Dkt. # 38 at 15 (quoting *Coszalter v. City of*
13	*Salem*, 320 F.3d 968, 976 (9th Cir. 2003)). Rather, it was a mild remedial action that Zemplenyi
14	herself testified was "not burdensome." Dkt. # 37, Howard Decl. Ex. B. 231.
15	       7. Lost office space
16	Zemplenyi contends that when she was transferred to a new clinic location in early 2006
17	she was forced to share office space with a technician in a diabetic foot care clinic and later lost
18	even this office space. A claim based on having to share the office is time-barred. Washington's
19	"catch-all" three-year statute of limitations applies to Zemplenyi's FCA retaliation claim. *See*
20	*United States v. Hughes Aircraft Co.*, 162 F.3d 1027, 1034-35 (9th Cir. 1998); *United States ex*
21	*rel. Marchese v. Cell Therapeutics*, No. C06-168MJP, 2007 WL 2572347, at *3 (W.D. Wash.
22	Sept 6, 2007); Wash. Rev. Code § 4.16.080(2). Zemplenyi was transferred to the new clinic in
23	April 2006 and did not file suit until May 2009. *See* Dkt. # 1; Dkt. # 20 ¶ 89.
24

To the extent Zemplenyi bases her claim on the total loss of office space, her claim is not time-barred. It nonetheless fails. There is no evidence that Lee ordered or condoned this incident. To the contrary, the undisputed evidence shows that Lee was frustrated with the office space problems and strongly supported efforts to fix them. Dkt. # 42 Ex. E. If Zemplenyi was aware of Lee's involvement in the office space issue, she would not have perceived the "disrespect and failure to support her practice" she now claims. Dkt. # 38 at 15.

## IV. CONCLUSION

Having reviewed the relevant briefs, the declarations and exhibits attached thereto, and the remainder of the record, the Court hereby finds and ORDERS:

(1) Group Health's Motion for Summary Judgment (Dkt. # 37) is GRANTED.

(2) Group Health's request for oral argument (Dkt. # 37; Dkt. # 42) is DENIED as moot.

(3) Group Health's request to strike Zemplenyi's brief in part or in its entirety (Dkt. # 42 at 1-2) is DENIED as moot.

(4) The Clerk is directed to forward a copy of this Order to all counsel of record.

Dated this 10th day of May 2012.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE